**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

|  |  |
|---|---|
| LAURA FRANCES HAYS, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NISSAN NORTH AMERICA INC., NISSAN MOTOR COMPANY, LTD., <br><br> Defendants. | Case No. _____ <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

### NATURE OF THE CASE

1.      Plaintiff brings this proposed class action on behalf of herself and all other Missouri owners of Nissan Altima automobiles for model years 2002-2006 ("Class Vehicles"). Nissan sold the Class Vehicles without disclosing to consumers that Nissan had opted to install floorboards in the vehicles that do not withstand normal exposure to the elements, do not drain properly and rust through to the degree that holes open up completely through the floorboard allowing visible exposure to the roadway beneath the vehicle ("Defect").

2.      As a result of the Defect, there has been at least one reported accident with injuries.  Hundreds of other drivers have told Nissan and the National Highway Traffic Safety Administration that they feel unsafe driving their Class Vehicles.  Because the replacement of the floorboard can cost several thousand dollars, and because Nissan refuses to recognize the existence of the Defect or to cover the full cost of repairs, many owners of Class Vehicles are not in a position to replace the defective floorboard when they discover the problem.  Additionally,

Nissan has provided no assurances that any replacement floorboard will not suffer from the same problems.

3. Nissan's conduct violates Missouri law, including the Missouri Merchandising Practices Act. On behalf of herself and the proposed Class, Plaintiff seeks to compel Nissan to warn drivers about the Defect and to bear the expense of replacing floorboards in Class Vehicles that should never have been placed in the stream of commerce in the first place.

## PARTIES

4. Plaintiff Laura Frances Hays is a citizen and resident of Jackson County, Missouri.

5. Defendant Nissan North America, Inc. has its headquarters and principal place of business in Franklin, Tennessee. Nissan North America, Inc. is the U.S. subsidiary of Nissan Motor Company, Ltd., which is a company that has its headquarters in Japan. Nissan North America, Inc. and Nissan Motor Company, Ltd. shall collectively be known as "Nissan."

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed plaintiff class, the aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which Nissan and class members are citizens of different states.

7. This Court may exercise jurisdiction over Nissan because Nissan is registered to conduct business in Missouri; has sufficient minimum contacts in Missouri; and intentionally avails itself of the markets within Missouri through the promotion, sale, marketing, and distribution of its vehicles, thus rendering the exercise of jurisdiction by this Court proper and

2

necessary.  Moreover, Nissan's wrongful conduct (as described herein) foreseeably affects consumers in Missouri.

8.     Plaintiff purchased her Nissan vehicle in the State of Missouri, and suffered damages as a result of Nissan's conduct within Missouri.

9.     Nissan North America, Inc. maintains a website at www.nissanusa.com.[1] According to this website, there are 16 Nissan dealers in Missouri. On the website, consumers in each state can view a listing of all names, addresses, and phone numbers of dealerships in their states.  Consumers may then click to "learn more" about a particular dealership and may view the dealerships inventory, obtain driving directions, contact the dealer, book a test drive, or view the dealer website.  Each individual dealer website will display local promotional marketing offers.

10.    Local promotional marketing offers are also available at Nissan's website[2] http://www.choosenissan.com by inputting a zip code or allowing the website to track a consumer's physical location.  The website is very interactive, and a consumer may also contact a local dealer and request a free Internet quote by inputting his or her name and contact information.

---

[1] http://www.nissanusa.com/global/privacy.html  (Accessed September 22, 2016).

[2] http://www.nissanusa.com/global/privacy.html?next=cn.dsp.featuredoffers.cn_privacylegal.nissanusa_privacylegal. (Accessed September 23, 2016).

11.     Further, the Nissan website offers consumers the option to "Build & Price" a Nissan specifically for the consumer and his or her needs.[3]  Consumers throughout Missouri have this option.  Consumers are also able to "View Local Offers" which allows a consumer to see Nissan's financing and other offers on a variety of its vehicles and further prompts the consumer to "Contact Dealer" to further investigate the financial offers.[4]

12.     Nissan further avails itself for business in Missouri by allowing Parts and Accessories to be bought and sold off its website to Missouri.[5]

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**SUBSTANTIVE ALLEGATIONS**

**The Altima Floorboard Defect**

14.     Nissan manufactures, markets, distributes, and warrants automobiles in the United States, including Nissan Altima automobiles.

15.     All model year 2002-2006 Altima automobiles manufactured and distributed by Nissan (the "Class Vehicles") have defective floorboards that prematurely rust and crack when exposed to the elements during normal operation of the vehicles.

16.     The Class Vehicles suffer from a Defect that prevents water from draining from the floorboard area of the vehicle and causes floor pans to corrode from the inside out.  The

---

[3] http://www.nissanusa.com/buildyournissan/?lang=en&_vipreq=2026807249 (Accessed September 23, 2016)

[4] http://www.choosenissan.com/columbia-sc-area/nissan-offers/ (Accessed September 23, 2016)

[5] http://www.owners.nissanusa.com/nowners/navigation/partsAcceSearch (Accessed September 23, 2016)

extent of the corrosion can be seen in the photographs reproduced below.[6]



17.     While the design defect was latent to Nissan consumers, Nissan knew or should have known that the Altima floorboards were defectively designed. The degradation from the Defect causes the floorboards in Class Vehicles to rust completely through, exposing the underside of the vehicle to road surface and the elements.  As a result, drivers and passengers are exposed to debris and other roadway objects entering the cockpit of the automobile, as well as to inadvertently putting their feet and legs through the opening.

18.     The Altima floorboards have a concave design, which allows moisture to accumulate and remain in the affected area.

19.     Affected model year floorboards consist of multiple layers, which are all attached together: a dampening layer immediately under the carpeted area where a driver's feet sit; a metal member immediately below the dampening layer; a floorpan layer beneath the member layer; and a layer of undercoating at the bottom.

_____

[6] These pictures were also reproduced in a news story at: http://www.nbcnews.com/news/us-news/rust-n333291

5

20. While there are multiple potential paths for moisture to enter the floorboards, the floorboards were designed with a hole through the middle metal layers—the member layer and the floorpan layer, approximately 1 inch in diameter. The floorboard holes are patched over with tape, rather than a watertight grommet or other watertight material. This patch extends just beyond the edges of the holes running through the metal layers. The member layer sits below the patch. This single patch is intended to cover both the member layer hole and floorpan layer hole, but the patch does not attach directly to the floorpan layer. Undercoating material sometimes covers these holes and the patching tape from underneath, but because there is no rigid material for the undercoating to bond to in the area of the hole, the undercoating fails to provide a long term watertight seal in this area. Additionally, vibration and any resulting contact between the floorpan layer and member layer causes wear to the painted coating, eventually exposing the metal layers to moisture and further resulting in accelerated corrosion of the floorboard. Water that enters through the compromised undercoating in the area of the holes, intrudes into the area between the two metal layers where the corrosion process appears to typically initiate and progress in a severe manner often resulting in complete perforation of the floorpan.

21. Nissan designed their defective floorboards with a metal member attached directly on top of the concave section of the floorboard by welds that join only the perimeter of the member to the floorboard. The combination of this layered design and the insufficiently patched holes in the metallic layers was a design defect that created the conditions for accelerated corrosion. The member isolates this concave region of the floorboard from the carpeted foot well, reducing the likelihood that any accumulated moisture could be wicked away from the metal floor pan by the carpeting or any padding material. Instead, a small gap exists between the top of the floorboard and underside of the member on top. The defective floorboard design thus

traps moisture, creating a cycle of corrosion that continually re-starts because the defective design results in abrasive contact between the corroding layers of the floorboard at the corroded area.

22.     The gap between top of the floorpan layer and the underside of the attached member layer is small enough that contact and mechanical interaction occurs between the mating surfaces of the two members during normal operation of the vehicle due to vibration and deflection of the floorboard and/or member.  Vibration or any other repeated relative movement between the floorpan and the attached member, as would be expected under normal driving conditions, will cause paint and/or coating on these components to deteriorate and will continually disturb and abrade any oxide (rust) that forms on these surfaces. This abrasion will remove newly formed corrosion products and re-expose the underlying steel that will then form a new corrosion layer.  This mechanism significantly accelerates the corrosion process.

23.     Eventually, the corrosion can create holes large enough for a driver's feet and legs to slide through.

24.     Nissan either knew or should have known that the floorboard design was defective and would be prone to accelerated corrosion.

25.     Contrary to Nissan's assertions, this level of severe floorboard corrosion is unusual and unexpected.  For example, comparable Hyundai, Toyota, Saturn, Volkswagen, Ford, Dodge, and Mazda vehicles exhibit no (or virtually no) corrosion in the floor pan areas, whereas affected Nissan model years exhibit severe corrosion in a consistent and specific area and consistent and specific pattern.

26.     Comparable vehicles from other manufacturers also do not share the defective design seen in affected model years.  2002 Volkswagen Golfs, for example, have multiple

7

layered floorboards that also have floorpan holes. But unlike class vehicles, these holes are sealed with plastic plugs that are mechanically affixed with waterproof adhesive. This plug seals the floorpan hole from both the top and bottom, preventing moisture from entering and accumulating. 2002 Golfs also have a member layer that is designed differently than affected model years. The member layer, which is attached beneath the floorpan layer, does not extend across the floorpan area, and instead bisects the floorpan area.

27. Significantly, Altimas manufactured outside of the affected model year ranges are also designed differently and have not experienced the severe corrosion seen in the affected model years. For example, while 1997 Nissan Altimas have a layered floorpan with holes in the floorpan, 1997 Altimas have a floorpan design much more similar to 2002 Volkswagen Golfs than to later Altima model years within the affected range. 1997 Altimas have a member layer that is designed differently than affected model years. Similar to 2002 Volkswagen Golfs, the member layers in 1997 Altimas do not extend across the floorpan area. The member layer, which is attached beneath the floorpan layer, bisects the floorpan layer. The 1997 Altima floorpan uses only one layer of metal so water does not become trapped in between metallic layers as in the later Altima model years. The patch over the floorpan also provides a better seal because it does not span multiple layers of metal as in the affected Altimas.

28. 1997 Altimas do not show the severe corrosion present in affected Altima model years.

29. While Nissan denies that the defective floorboards present safety issues, the passenger safety issues created by these corroded floorboards are serious and potentially lethal. Any floorboard degradation in unibody vehicles poses a serious potential safety hazard. In the event of a collision a degraded floorboard can increase the chance of injury or death to the

vehicle's occupants by reducing the vehicle's structural integrity as well as the integrity of the component parts that attach to the floorboard, such as passenger seating. In locations that require vehicle safety inspections, automobiles with degraded floorboards will not pass inspection, leaving owners unable to use their vehicles.

30. Nissan Altimas with corroded floorboards that experience engine fires pose a serious safety hazard to passengers, because fire can readily travel unobstructed through the corroded floorboard into the cabin of the car.

31. Nissan Altimas with corroded floorboards that crash into rivers, lakes, or other waterways also pose serious safety hazards, as such vehicles would sink and fill with water more quickly than vehicles with non-defective floorboards.

32. The corrosion can also allow exhaust and other harmful fumes to enter the cabin.

33. Below are examples of complaints lodged with NHTSA reflecting drivers' safety concerns:

> • 2005 Altima: I RECENTLY PURCHASED A 2005 NISSAN ALTIMA FOR MY SON WHO IS GOING AWAY TO COLLEGE. WHEN SEEING ON THE NEWS ABOUT THE RUST ISSUES WITH THE ALTIMA'S I IMMEDIATELY WENT AND CHECKED UNDERNEATH THE CAR TO DISCOVER THAT BOTH THE DRIVER AND PASSENGER SIDE FLOORBOARDS ARE RUSTED THROUGH TO THE INSIDE OF THE VEHICLE. THE CAR HAS BEEN PROPERLY MAINTAINED AND IN EXCELLENT CONDITION OTHERWISE. DUE TO THE MULTIPLE ISSUE IN THE 2002-2006 NISSAN ALTIMAS I BELIEVE THIS NEEDS TO BE A SAFETY RECALL DUE TO THE POSSIBILITY OF EXHAUST FUMES ENTERING THE VEHICLE. AT THE VERY LEAST NISSAN SHOULD PROVIDE A GOODWILL RECALL AND STOP TRYING TO PUSH THE BLAME ON OTHER ISSUES. (date of incident: 4/8/15, date of complaint: 4/8/15).[7]

---

[7] NHTSA ID Number: 10704518.

- <u>2002 Altima</u>:  I HAVE MAILED AN OFFICIAL LETTER SINCE THE SPACE PROVIDED IS NOT SUFFICIENT FOR MY COMPLAINT. THE CONSUMER STATED DURING A RECENT OIL CHANGE, THE TECHNICIAN NOTICED AN ENORMOUS RUSTED HOLE ON THE DRIVER'S SIDE OF THE FLOOR PANEL UNDERNEATH THE VEHICLE. THE PASSENGER SIDE ALSO HAD A BIG RUSTED SPOT WHERE ANOTHER HOLE WAS DEVELOPING. THE CONSUMER WAS ADVISED BY A REPAIR SHOP TO REPLACE THE ENTIRE FLOOR PANEL SINCE IT WAS SO BADLY RUSTED. THE CONSUMER BELIEVED THE DEFECT WAS DUE TO THE ABSENCE OF DRAIN HOLES IN THE FLOOR PAN UNDERNEATH THE VEHICLE. THE DRAIN HOLES WERE VISIBLE TO HAVE BEEN OUTLINED, BUT THEY WERE NEVER DRILLED THROUGH.  THE WATER FROM THE AIR CONDITIONER WOULD GET TRAPPED ON TOP OF THE FLOOR PANEL AND COLLECT THERE, EVENTUALLY CAUSING RUST..  (date of incident: 8/23/10, date of complaint: 10/18/10).[8]

- <u>2003 Altima</u>:  FLOOR RUSTED THROUGH ON A 2003 NISSAN ALTIMA 3.5 SE WITH ONLY 55000 MILES ON IT. IN SERVICE DATE OF THE VEHICLE WAS APRIL 30, 2003. THE HOLE IN THE FLOOR OF THE VEHICLE WAS NOTICED IN MAY OF 2009. RUST PERFORATION WARRANTY FROM NISSAN IS FOR 5 YEARS ONLY. NISSAN UNWILLING TO HELP. EXHAUST AND OTHER FUMES CAN ENTER THE CAR. THIS IS UNACCEPTABLE FOR A CAR WITH THIS LOW MILEAGE.  (date of incident: 5/17/09, date of complaint: 5/29/09).[9]

- <u>2003 Altima</u>:  I OWN A 2003 NISSAN ALTIMA THAT WAS PURCHASED BRAND NEW.  THE CAR HAS NEVER BEEN IN AN ACCIDENT AND HAS ALWAYS BEEN WELL MAINTAINED...WASHED AND WAXED REGULARLY. I WAS CHANGING THE OIL ON 7/28/09 AND NOTICED SOMETHING HANGING FROM THE PASSENGER SIDE FLOOR WHICH TURNED OUT TO BE THE REMAINS OF SAID FLOOR. THERE IS A RUST HOLE APPROXIMATELY 2 FOOT LONG AND 6 INCHES WIDE IN THE PASSENGER SIDE OF THIS 6 YEAR OLD CAR. AFTER DOING SOME RESEARCH ONLINE I SEE THIS IS A FAIRLY COMMON FAILURE FOR THIS GENERATION ALTIMA AND NISSAN WILL DO ABSOLUTELY NOTHING TO HELP WITH THE REPAIR SINCE

---

[8] NHTSA ID Number: 10360974.

[9] NHTSA ID Number: 10269941.

THE PERFORATION WARRANTY IS OVER AS OF 10/08. I HAVE HAD THE CAR INTO THE DEALERSHIP FOR RECALL WORK AND NOBODY FROM THE DEALERSHIP EVER MENTIONED THE HOLE IN THIS VEHICLE WHICH AT THAT TIME WOULD HAVE BEEN COVERED BY WARRANTY. NISSAN FLAT OUT DENIES TO DO ANYTHING TO HELP WITH THE REPAIR REGARDLESS OF THE FACT THAT THIS SHOULDN'T BE HAPPENING TO A 6 YEAR OLD CAR IN THE FIRST PLACE. IT'S AN OBVIOUS SAFETY ISSUE WITH A GIANT HOLE IN THE FLOOR THAT EXHAUST FUMES CAN ENTER BUT NISSAN REFUSES TO ACKNOWLEDGE THE DESIGN FLAW IN THIS VEHICLE. PLEASE HELP ME TO FORCE NISSAN TO ADMIT THE PROBLEM EXISTS AND GET IT FIXED AT THEIR COST. (date of incident: 7/28/09, date of complaint: 8/21/09).[10]

- 2002 Altima: DEFECTIVE SHEET METAL DESIGN IN FLOOR PAN OF NISSAN ALTIMAS, BODY STYLE BEGINNING WITH MODEL YEAR 2002. DESIGN FLAW CAUSED LARGE RUST HOLES IN FRONT OF DRIVER AND PASSENGER SEAT, SEEMINGLY BY TRAPPING MOISTURE. MY HOLES APPROX 12" EACH. I AM HEARING SIMILAR COMPLAINTS FROM OTHER ALTIMA OWNERS. PERFORATION WARRANTY WAS 5 YEARS, AND DUE TO MY DEALERSHIP NOT NOTICING THE PROBLEM WITHIN THAT PERIOD, NISSAN CLAIMS NO RESPONSIBILITY. THESE HOLES MAY ALTER THE STRUCTURAL INTEGRITY OF THE BODY FRAME IN CASE OF SIDE IMPACT. ADDITIONALLY, WATER ENTERS THE CABIN AND REMAINS IN THE CARPET AND PAD. MY FLOOR PAN WILL NEED TO BE REPLACED, AND AM PREPARING TO SCHEDULE THE WORK. NISSANS RECOMMENDED LOCAL BODY SHOP HAS ESTIMATED REPAIRS APPROX. $2300 US. (date of incident: 6/18/09, date of complaint: 8/21/09).[11]

- 2005 Altima: TOOK MY CAR IN TO BE INSPECTED (PA INSPECTION). FLOOR PAN ON MY 2005 ALTIMA IS COMPLETELY RUSTED THROUGH ON THE PASSENGER SIDE OF THE VEHICLE. NEEDS TO HAVE FLOOR PAN REPLACED. THIS CAR HAS VERY LOW MILEAGE, IS CLEAN AND GARAGE KEPT. CHECKED THE INTERNET, AND NOTICED QUITE A FEW COMPLAINTS ABOUT RUST ON THE PASSENGER AND DRIVE SIDE. NOTHING ELSE IS SHOWING RUST.

---

[10] NHTSA ID Number: 10281316.

[11] NHTSA ID Number: 10281326.

HOW CAN ONE PART COMPLETELY RUST OUT AND THE REMAINING PART OF THE CAR HAS NONE AT ALL?? APPARENTLY THERE IS A DEFECT THAT IS HOLDING WATER/MOISTURE AND CAUSING THE RUST. THE CAR DOES NOT HAVE ANY MECHANICAL ISSUE BASICALLY LIKE NEW. HOWEVER, TOTALLY RUSTED OUT IN ONE SPOT. (date of incident: 3/6/10, date of complaint: 3/5/10).[12]

- 2006 Altima: VEHICLE IN QUESTION: 2006 NISSAN ALTIMA, CURRENTLY NISSAN?S ORIGINAL 60 MONTH UNLIMITED MILE RUST WARRANTY. 72,296 MILES. DRIVER AND PASSENGER FLOOR BOARD AREA ARE RUSTING THROUGH. (AROUND THE FOOT WELL AREA.) I BELIEVE THIS TO BE A KNOWN-DEFECT AND KNOWN ISSUE WITH THIS VEHICLE AND NISSAN IS NOT CORRECTING THIS ISSUE. I KNOWN OTHER NISSAN ALTIMA OWNERS WHO HAVE HAD THE SAME PROBLEM AND THERE ARE NUMEROUS CASES OF THIS PROBLEM DOCUMENTED ON REPUTABLE WEB SITES. THIS IS A SAFETY ISSUE. THE DRIVER?S AND PASSENGER?S FEET CAN PUSH THROUGH THE FLOOR AND ARE NOT ADEQUATELY PROTECTED DUE TO THE WEAKENED, RUSTED METAL SHOULD A ACCIDENT OCCUR. APRIL 15, 2010 SPOKE WITH ROLAND KOSTIEW (ROCKINHAM NISSAN SERVICE MANAGER) VIA TELEPHONE AND HE STATED: THAT HE HAS SEEN THIS RUST-THROUGH PROBLEM BEFORE? AND NISSAN DOESN'T DO ANYTHING ABOUT IT. HE WILL FIGHT FOR ME BECAUSE I AM A LOCAL CUSTOMER. NISSAN ATTRIBUTES THE PROBLEM TO THE FLOORBOARD AREA BEING USED AS A JACK-MOUNT POINT. HE TOOK PICTURES SHOWING THIS WAS NOT THE CASE AND HE AGREED THAT WOULD BE A RIDICULOUS POINT TO USE TO LIFT THE VEHICLE. APRIL 16, 2010 WAS INFORMED BY ROLAND KOSTIEW (ROCKINHAM NISSAN SERVICE MANAGER) VIA TELEPHONE THAT NISSAN WILL NOT COVER THE UNDERBODY RUST THROUGH AND THAT IT IS NOT COVERED BECAUSE OF ENVIRONMENTAL CAUSES WITH NO FURTHER EXPLANATION. (date of incident: 4/16/10, date of complaint: 4/17/10).[13]

- 2002 Altima: I HAVE A 2002 NISSAN ALTIMA AND IT HAS DEVELOPED A LARGE RUST HOLE UNDER THE PASSENGER AND DRIVER SIDE FLOOR PAN. THE CAR WAS RUST PROOFED WHEN IT

---

[12] NHTSA ID Number: 10319934.

[13] NHTSA ID Number: 10326176.

WAS PURCHASED NEW. IT HAS NOT BEEN IN ANY ACCIDENTS. OTHER ALTIMA OWNERS HAVE NOT HAD ANY LUCK WITH NISSAN TO CORRECT THIS PROBLEM. THIS IS A COMMON PROBLEM/DEFECT THAT NISSAN REFUSES TO CORRECT. (date of incident: 4/17/10, date of complaint: 4/19/10).[14]

- 2005 Altima: I HAVE BOUGHT BRAND NEW 2005 NISSAN ALTIMA 3.5SE IN OCTOBER OF 2004. JUST YESTERDAY DURING MY OIL CHANGE I HAVE NOTICED A HOLE UNDERNEATH THE CAR AND RUSTED AREA IN THE DIAMETER OF A FOOT OR SO. FLOORING RUSTED AND IT WAS OBVIOUSLY RESULT OF NOT FORCED DAMAGE BUT DEFECTIVE MATERIALS USED TO MAKE THE CAR FLOORING. I AM FINDING FORUMS AND LOADS OF COMPLAINTS THAT RIGHT AFTER THE WARRANTY IS EXPIRED CAR'S FLOORING SIMPLY START TO RUST. I DO NOT KNOW WHAT TO DO AND I AM SURE DEALERSHIP WILL TURN ME AWAY AS THE CAR IS NOT UNDER WARRANTY AND THEY USUALLY DO NOT HAVE BODY SHOPS. WHO CAN HELP ME AS I SPENT ABOUT $33,000.00 FOR THIS CAR (LAST 6 YEARS OF PAYING IT OFF.... HELP!!?!? * (date of incident: 5/8/10, date of complaint: 5/9/10).[15]

- 2002 Altima: RE: 2002 NISSAN ALTIMA. THERE IS SEVERE RUST AND CORROSION IN SPECIFIC LOCATIONS DIRECTLY UNDER BOTH THE DRIVER AND FRONT PASSENGERS SEATS AND FLOORS. THE CORROSION APPEARS TO BE RELATED TO TWO FACTORY HOLES IN THE FLOOR, ONE ON EACH SIDE OF THE VEHICLE. THE CORROSION ON THE PASSENGER SIDE OF OUR CAR IS LESS SEVERE: A LARGE AREA OF RUST BUT A RELATIVELY SMALL HOLE (TENNIS BALL SIZE) THROUGH THE SHEET METAL. THE DRIVERS SIDE OF THE CAR HAS A LARGE HOLE (SOCCER BALL SIZE) IN THE FLOOR. THIS IS THE ONLY MAJOR CORROSION ON THE CAR (THE "REAR SUBFRAME" ASSEMBLY WAS REPLACED IN 2006 DUE TO CORROSION UNDER A NISSAN WARRANTY PROGRAM). THE FUEL FILLER NECK IS ALSO RUSTY AND DOES NOT SEAL PROPERLY, WHICH CAN CAUSE AN ENGINE ALERT WHEN THE FUEL VAPOR SEAL LEAK REACHES THE POINT WHERE THE ALERT IS TRIGGERED. THERE IS LITTLE OR NO CORROSION IN THE WHEEL WELLS OR FENDERS. BASED ON TWO BIDS FROM AUTO BODY

---

[14] NHTSA ID Number: 10326482.

[15] NHTSA ID Number: 10329506.

SHOPS IN THIS AREA, THE COST TO REPAIR THE RUST DAMAGE
WILL BE BETWEEN $2500 AND $3200. I HAVE TAKEN PHOTOGRAPHS
OF APPROXIMATELY FORTY ALTIMAS IN THIS AREA. ALL BUT FIVE
HAVE CORROSION IN THIS SPECIFIC AREA TO VARYING DEGREES.
IT IS CLEARLY NOT LIMITED TO ONLY THE CAR WE OWN. NISSAN
HAS A WARRANTY PROGRAM WHICH COVERS RUST PERFORATION
FOR A PERIOD OF FIVE YEARS FROM THE DATE OF MANUFACTURE.
I HAVE SPOKEN TO A NUMBER OF PEOPLE AT A DEALER IN THIS
AREA REGARDING THIS PROBLEM. THEY CLAIM THAT NISSAN IS
AWARE OF THIS PROBLEM ON 2001 THROUGH 2005 ALTIMAS, BUT
HAS CHOSEN NOT TO WARRANT IT DUE TO THE EXPENSE,
PREFERRING INSTEAD TO REFUSE TO BE RESPONSIBLE. NISSAN
WILL APPARENTLY TAKE THE CARS IN TRADE AND SELL THEM TO
WHOLESALE AUTO OPERATIONS WHERE THEY ARE SOLD TO
CUSTOMERS WHO MAY OR MAY NOT BE AWARE OF THE PROBLEM.
(date of incident: 4/1/10, date of complaint: 9/28/10).[16]

- 2006 Altima: I PURCHASED A NEW 2006 NISSAN ALTIMA
ON 12-22-05. ON 1-8-11 I NOTICED A 6 TO 8 INCH RUST HOLE
COMPLETELY THROUGH THE FLOORBOARD OF THE DRIVER'S SIDE
FLOOR JUST FORWARD OF THE DRIVER'S SEAT. THE DEALERSHIP
AND NISSAN AMERICA HAS REFUSED TO FIX THE PROBLEM
STATING THAT THE WARRANTY HAD RUN OUT ON THE VEHICLE
BY 2 WEEKS. MY CONTENTION IS THAT PROBLEM IS MATERIAL OR
WORKMANSHIP DEFECT AND THAT THE PROBLEM HAS BEEN
ONGOING AND ONLY DISCOVERED AT THIS TIME. I AM CERTAIN
THAT THIS DAMAGE WILL COMPROMISE THIS VEHICLES
PERFORMANCE IN A CRASH, POTENTIALLY ALLOW EXHAUST
FUMES TO ENTER THE OCCUPANT CABIN AND BE GENERALLY A
SAFETY HAZARD FOR THE DRIVER WHO RESTS HIS OR HER FEET
DIRECTLY ON THIS AREA. I HAVE READ INTERNET REPORT THAT
DESCRIBE FEMALES HIGH HEELS GETTING CAUGHT IN THE
RUSTED FLOOR WHILE DRIVING. (date of incident: 1/8/11 date of
complaint: 1/21/11).[17]

- 2004 Altima: EXCESSIVE PREMATURE RUST ON DRIVER
AND FRONT PASSENGER FLOOR PAN. BOTH ARE ABOUT 5"X10" IN
SIZE AND CONSISTENT WITH MOST OTHER NISSAN ALTIMA RUST

---

[16] NHTSA ID Number: 10358132.

[17] NHTSA ID Number: 10378195.

COMPLAINTS FOR CARS OF SIMILAR AGE. SINCE NOTICING THE RUST I HAVE LOOKED AT DOZENS OF SIMILAR NISSAN ALTIMAS IN STORE PARKING LOTS ALL WITH THE SAME PREMATURE RUST PATTERN. IT APPEARS THAT NISSAN DESIGNED THE FLOOR PANS WITH A DRAIN PLUG WHICH ALLOWS WATER PENETRATION ABOVE THE FLOOR PAN WHERE IT CAUSES RUST. THE REST OF THE FLOOR PAN ON THE ENTIRE VEHICLE IS IN EXCEPTIONALLY PRISTINE SHAPE, BUT DUE TO THE IMPROPERLY DESIGNED/INSTALLEDFLOOR PLUGS THE RUST HAS CAUSED HOLES TO DEVELOP IN THE FLOOR PAN AROUND THE FRONT PASSENGER COMPARTMENT. UPON NOTICING THE RUST, I TALKED WITH A LOCAL MECHANIC WHO STATED HE HASN'T SEEN A NISSAN ALTIMA OF SIMILAR AGE IN HIS SHOP THAT DID NOT HAVE IDENTICAL RUST PATTERNS IN THE SAME SPOT. THIS IS OBVIOUSLY A MANUFACTURERS DEFECT AND THE RUST IN THIS ONE AREA AROUND THE DRAIN PLUGS IS INCONSISTENT WITH THE LACK OF RUST EVERYWHERE ELSE. HOLES IN FLOORBOARDS OF LATE MODEL CARS IS A HUGE SAFETY CONCERN BECAUSE MOST CONSUMERS WOULD NEVER SUSPECT THIS WOULD BE AN ISSUE ON LATE MODEL CARS WHICH ARE OTHERWISE NOT SHOWING ANY SIGNS OF RUST. HOLES IN THE FLOORBOARDS CAN ALLOW PENETRATION OF DEADLY EXHAUST FUMES, ESPECIALLY IN STOP AND GO TYPE DRIVING AS WELL AS PERSONAL SAFETY RISK AS THIS WEAKENS THE OVERALL STRENGTH OF THE UNIBODY DESIGN IN A CRASH. ALSO IF UNDETECTED LONG ENOUGH IT CAN CAUSE SEATS TO LOOSEN AND FALL FROM THEIR MOUNTS. I STRONGLY URGE THE NATIONAL HIGHWAY TRANSPORTATION SAFETY BOARD TO ISSUE AN IMMEDIATE RECALL SINCE IT APPEARS THE MANUFACTURER IS UNWILLING TO ACKNOWLEDGE THE RISK IT IS PUTTING ON CONSUMERS. (date of incident: 9/29/11, date of complaint: 9/30/11).[18]

- 2005 Altima:  2005 NISSAN ALTIMA WITH 80,000 MILES ON IT. MY FATHER TOOK HIS CAR INTO BE INSPECTED AND THEY WILL NOT PASS IT BECAUSE OF THE FLOOR BOARDS COMPLETELY RUSTED OUT. AFTER RESEARCHING THIS ONLINE, THERE ARE MILLIONS OF DISSATISFIED NISSAN OWNERS WHO ARE BATTLING THIS VERY PROBLEM. NOW, IF MY FATHER CANNOT GET HIS CAR TO PASS INSPECTION, HE CANNOT USE IT. SO FAR, NISSAN HAS NOT DONE ANYTHING TO HELP WITH HIS ISSUE. MY FATHER HAS

[18] NHTSA ID Number: 10428093.

CALLED COUNTLESS REPAIR AND BODY SHOPS AND NO ONE WILL REPAIR ANY RUST. NOT EVEN THE DEALERSHIP. THE CUSTOMER SERVICE REP AT THE NISSAN DEALERSHIP WAS NOTHING MORE THAN RUDE AND INSENSITIVE BUT DID TELL MY DAD THAT THERE HAVE BEEN NUMEROUS COMPLAINTS AND REPAIR QUESTIONS ABOUT RUSTING FLOOR BOARDS. I HAVE SEEN PEOPLE CALL NISSAN CORPORATE HEADQUARTERS WITH THE SAME "SORRY" RESPONSE. NISSAN IS LOOKING AT A VERY LARGE CLASS ACTION LAWSUIT WHICH I WILL PURSUE TO THE FULLEST BECAUSE OF THEIR LACK OF RESPECT FOR THEIR CUSTOMERS AND FOR THEIR CRAFTMANSHIP, LACK OF CONCERN, LACK OF SOLUTIONS. I HOPE I AM JOINED BY ANYONE ELSE WHO IS BATTLING THIS PROBLEM, LEAVE YOUR COMPLAINT HERE, AND HOPEFULLY SOME HELP WILL BE COMING SOON! (date of incident: 9/8/14, date of complaint: 9/8/14).[19]

### Nissan's Knowledge of the Defect and the Dangers Posed

34.     Nissan knew or should have known when it sold the Class Vehicles that these vehicles contained the Defect, that their floorboards would not hold up to exposure to the elements, and that as a result of the Defect the Class Vehicles were rendered unsafe and dangerously defective.

35.     Nissan has known for a number of years that drivers were complaining that the floorboards in Altimas were rusting prematurely.  As illustrated in the examples quoted above, owners of Class Vehicles began complaining to NHTSA as far back as 2008, yet Nissan did not notify owners of Class Vehicles of the Defect until several years later.

36.     Despite Nissan's knowledge since at least 2008 that its Altima floorboards prematurely degraded with exposure to water, it continued to install floorboards that suffered from the Defect. Furthermore, Nissan never extended its warranty to owners of Class Vehicles

---

[19] NHTSA ID Number: 10631474.

with rusted floorboards, and in nearly all cases denied warranty liability or blamed the owners themselves for causing the corrosion.

37.     Given the faulty construction of the floorboards in Class Vehicles, Nissan knew or should have known that the floorboards corrode and rust completely through when exposed to the elements during normal operations.  Nissan nonetheless decided to sell Class Vehicles without altering the floorboards, putting Nissan owners, drivers, passengers, and others on the road at risk.  Nissan did not tell customers that the floorboards would corrode and rust completely through when exposed to the elements during normal operations.  Nissan thus had exclusive and superior knowledge of the floorboard Defect and actively concealed the Defect and corresponding danger from consumers who had no way to reasonably discover the problem before buying and driving their Class Vehicles.

38.     Had consumers been aware of the floorboard Defect in their Class Vehicles, they would not have purchased their vehicles or would have paid far less money for them.  As Nissan knows, a reasonable person would consider knowledge of the Defect important information and would not purchase or lease a vehicle with a dangerously defective floorboard or would pay substantially less for the vehicle.

39.     Although there have been numerous complaints about the floorboards through the NHTSA website (which Nissan monitors), posted on Nissan's Facebook page, and made directly to Nissan customer service, Nissan continues to deny the existence of the Defect.  Additionally,

the Defect was discussed in a "Today" news segment on NBC, which showed pictures of the corrosion.[20]

40.    To the extent Nissan has acknowledged the Defect, Nissan has refused to make consumers whole. Nissan issued a technical service bulletin arising from the Defect that applies to Class Vehicles. The bulletin calls for a "floor pan" repair because of the common development of floorboard rust and corrosion. The bulletin includes an example photograph, which depicts a floorboard with massive amounts of rust and a hole.

41.    Along with the service bulletin, Nissan sent a floor pan repair kit bulletin to its dealerships' service and parts managers, which discusses the "new, low-cost repair for floor pan corrosion." As with the technical service bulletin, this bulletin also applies to Class Vehicles.

42.    Neither bulletin instructs dealerships to monitor for floorboard rust generally, nor do they instruct dealerships to warn drivers about the Defect or its risks.

43.    Nissan's service bulletin instructs dealers to (1) clean the rusted area of the floorboard, and (2) using adhesive, install a "repair plate" that covers the rusted area of the floorboard. The bulletin does not instruct dealers to remove or excise the rusted area of the floorboard. In effect, the bulletin instructs dealers to apply a patch over the rusted area of the floorboard.

---

[20] http://www.nbcnews.com/news/us-news/rust-n333291

44.     If a consumer has the repair plate installed, the consumer will need to pay approximately five hundred dollars toward the repair offered by the bulletin, even though – according to the bulletin – the materials for the repair cost only $111.57.

**Nissan's Refusal to Repair the Defective Floorboards**

45.     Despite the overwhelming amount of evidence and number of complaints it has received about the damage and safety risks caused by the Defect, Nissan has refused to admit responsibility to its customers for creating the Defect or to cover the cost of repairs to the Class Vehicles.  The total for parts and labor to replace a floorboard is several hundreds of dollars or more, depending on the amount of damage.  Just the cost of the labor may total nearly $1,000, depending on the location of the Nissan dealership.

46.     Nissan's refusal to pay the complete cost of floorboard repairs has caused great hardship to Nissan owners.  Many drivers cannot afford to spend what could amount to thousands of dollars to replace their floorboards and are forced to continue to drive unsafe Class Vehicles.  Many owners also have difficulty selling their Class Vehicles because of their damaged condition.  All owners and operators of Class Vehicles are unnecessarily exposed to the outside elements as a result of damage to their Class Vehicles caused by the Defect.  More importantly, all owners and operators of Class Vehicles are exposed to a significant risk of harm in the form of exposure to exhaust fumes entering the interior and in the form of reduced structural integrity of the Class Vehicles.

**Plaintiff's Experience**

47.     Plaintiff purchased her 2003 Nissan Altima new in April 2003. She purchased the vehicle from McCarthy Nissan, which was situated in Jackson County, Missouri.

48.     Plaintiff kept her Class Vehicle in a garage during the entire time she owned it,

including during working hours when Plaintiff parked her vehicle in an underground parking garage.

49.    Plaintiff always had her Class Vehicle serviced at Nissan dealerships in the Kansas City area.

50.    Plaintiff never noticed any problem with the floorboard in her vehicle. However, in early 2015, she viewed a news report regarding rust in Nissan Altima floorboards. An inspection revealed substantial rust under the front passenger floorboard; the following pictures reflect the rust in Plaintiff's floorboard:





51.     After she discovered the rust in her floorboard, Plaintiff procured an estimate to repair the vehicle from Carstar, an automotive body repair shop located in Lee's Summit, Missouri. Carstar provided an initial estimate of $4,000.39 to repair the rust, but warned that the cost could exceed $5,000 based on the extent of the rust damage they discovered after removing body parts. Carstar's estimate was for a comprehensive and thorough repair, meaning it included removing all of the rust and replacing the affected parts of the vehicle.

52.     Plaintiff received another estimate from Blue Springs Collision Repair ("BSCR") in February 2015; BSCR is a different automotive body repair shop located in Blue Springs, Missouri. The BSCR estimate was for a "patch" repair, meaning that it did not remove the rust and replace those affected parts, but merely covered the rusted area with sheet metal. The BSCR estimate was for $459.00.

53.     In December 2015, Plaintiff had BSCR apply its patch repair, and paid BSCR $459.00 for the repair.

54.     Plaintiff contacted the Nissan dealership about the rust; the dealership referred her to Nissan Corporation. Plaintiff then contacted Nissan Corporation several times about the rust,

and she submitted the estimates provided to her by Carstar and BSCR for Nissan Corporation's review and consideration. After several weeks, Nissan Corporation notified Plaintiff that it would not provide any assistance for the rust or assist with repair costs.

55.     After paying for the patch repair and incurring $459.00 in damages associated with the rust, Plaintiff traded in the vehicle in March 2016 to Premier Mazda of Kansas City, located in Kansas City, Missouri. Plaintiff's Class Vehicle had approximately 103,000 miles on it when Plaintiff traded it in.

## TOLLING

56.     Any applicable statute of limitations that might otherwise bar any Class member's claim has been tolled by Nissan's knowing and active concealment of the facts alleged above. Plaintiff and Class members were ignorant of vital information essential to the pursuit of their claims. Plaintiff and Class members could not reasonably have discovered that their Nissan Altima vehicles were defective because Nissan did not provide relevant information about the defect to the NHTSA or to vehicle owners/lessors, and continues to refuse to provide such notice to consumers.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff seeks to represent the following Class, within which "Class Vehicle" is defined to include all 2002-2006 Nissan Altima vehicles:

**All persons who own or lease a Class Vehicle in the State of Missouri**.

58.     Excluded from the proposed class is Nissan; any affiliate, parent, or subsidiary of Nissan; any entity in which Nissan has a controlling interest; any officer, director, or employee of Nissan; any successor or assign of Nissan; anyone employed by counsel for Plaintiffs in this action; any judge to whom this case is assigned, his or her spouse, and all persons within the

third degree of relationship to either of them, as well as the spouses of such persons; and members of the judge's staff, and anyone who purchased a Class Vehicle for the purpose of resale.

59.     This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

60.     **Numerosity**.  Nissan sold thousands of Class Vehicles, including a substantial number in Missouri.  Members of the proposed Class likely number in the hundreds or thousands and are thus too numerous to practically join in a single action.  Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

61.     **Predominance**.  Common questions of law and fact exist as to all members of the proposed class and predominate over questions affecting only individual class members.  These common questions include whether:

a.     Class Vehicles were factory equipped with defective floorboards;

b.     Nissan knew or should have known about the Defect and, if so, when Nissan discovered the Defect;

c.     Knowledge of the Defect would be important to a reasonable person, for example, because it poses an unreasonable safety risk;

d.     Nissan disclosed the existence of the Defect to potential customers;

e.     Nissan concealed the existence of the Defect from potential customers;

f.     Nissan failed to provide free repairs of damage caused by the Defect;

g.     Nissan's conduct harmed Plaintiff and the Class;

h.      Plaintiff and the Class are entitled to equitable relief, including declaratory relief, restitution, rescission, a preliminary and/or permanent injunction; and

i.      Plaintiff and the Class are entitled to damages.

62.     **Typicality**.  Plaintiff's claims are typical of the claims of the proposed Class. Plaintiff and the proposed Class either purchased or leased a Class Vehicle that contains the same Defect, giving rise to substantially the same claims.

63.     **Adequacy**.  Plaintiff is an adequate representative of the proposed Class because her interests do not conflict with the interests of the members of the Class she seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously by monitoring and directing the actions of class counsel.  The interests of members of the class will be fairly and adequately protected by Plaintiff and her counsel.

64.     **Superiority**.  A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Nissan economically feasible.  Even if Class members themselves could afford such individualized litigation, the court system could not.  In addition to the burden and expense of managing many actions arising from the Nissan defect, individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

65. In the alternative, the proposed Class may be certified because:

a. the prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Nissan;

b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Nissan has acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

**FIRST CAUSE OF ACTION**
**Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.***
**(Plaintiff Individually and on behalf of the Class)**

66. Plaintiff, on behalf of herself and the proposed Class, hereby re-alleges the paragraphs above as if fully set forth herein.

67. Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (3d ed. 1998).

68. There is an actual controversy between Nissan and Plaintiff concerning:

a. Whether the Class Vehicles are defectively designed thus causing them to fail;

b. Whether Nissan knew or should have known of the Defect;

c. Whether Nissan failed to warn against the potential unsuitability of its defectively designed Class Vehicles;

d.      Whether Nissan knowingly denies the existence of the Defect in its Class Vehicles; and

e.      Whether Nissan bears responsibility for providing cost-free repairs for damage caused by the Defect in Class Vehicles.

69.      Pursuant to 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

70.      Despite the repeated, documented failures of the Class Vehicles, Nissan refuses to acknowledge they are defectively designed, frequently blaming its customers for causing the damage.

71.      Accordingly, based on Nissan's failure to act, Plaintiff seeks a declaration that the Class Vehicles are defective in their design, workmanship, and material choices, as alleged herein. The defective nature of the Class Vehicles is material and requires disclosure to all persons who own or lease a Class Vehicle.

72.      The declaratory relief requested herein will generate common answers that will settle the controversy related to the alleged defective design of the Class Vehicles and the reasons for their repeated failure. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## SECOND CAUSE OF ACTION
### Missouri Breach of Express Warranty
### (Plaintiff Individually and on behalf of the Class)

73.      Plaintiff, on behalf of herself and the proposed Class, hereby re-alleges the paragraphs above as if fully set forth herein.

74.      As fully pled above, Nissan had knowledge of the defects to its Class Vehicles and that they pose a serious safety risk to consumers like Plaintiff and Class members.

75.     Nissan expressly represented and warranted to Plaintiff and Class members by and through oral and written statements, descriptions, and affirmations of fact through its website, print advertising, marketing materials, that its Class Vehicles were safe and fit for their intended purposes.

76.     Nissan expressly represented and warranted the quality of the Class Vehicles against defects in materials and workmanship for a period of five years.

77.     Nissan publicized these statements to consumers and was aware that consumers would reasonably rely on these warranties related to the quality and workmanship of the Class Vehicles.

78.     These express warranties were necessarily material to the Plaintiff and Class Members who would have chosen to purchase a different product if they had possessed knowledge that the Defect would result in premature corrosion of the floorboard of Class Vehicles, causing damage that would require expensive repairs and creating significant safety risks to occupants of the Class Vehicles.

79.     At the time that Nissan made these express warranties, it knew the use for which the Class Vehicles were intended, and Nissan expressly warranted that they were fit and safe for their intended purpose.

80.     At the time that Nissan made these express warranties, it knew of the Defect in materials and workmanship inherent in the Class Vehicles, but continued to market the Class Vehicles by means of false and misleading information, and without acknowledging or warning consumers that the Defect would result in premature corrosion of the floorboard of Class Vehicles, causing damage that would require expensive repairs and creating significant safety risks to occupants of the Class Vehicles.

81.     The Class Vehicles purchased by Plaintiff and Class members did not conform to Nissan's promises and descriptions because:

a.      The design of the Class Vehicles suffers from a Defect that is known to corrode and fracture and which is substantially certain to fail when Class Vehicles are used for their intended purpose, due to Nissan's choice of materials. The Defect creates an unreasonably high likelihood of corroding and failing when subjected to the elements that it might reasonably and foreseeably be exposed to during normal and intended use.

b.      The design of the Class Vehicles suffers from a Defect which is known to allow occupants of the vehicle to be exposed to the outside elements, to be exposed to harmful exhaust fumes, and to compromise the structural integrity of the vehicle making its occupants more likely to suffer increased injury or even death in a vehicle crash.

82.     Plaintiff and the Class members have incurred damages including but not limited to the costs of repair of the damage to their Class Vehicles caused by the Defect, the diminution of value of their Class Vehicles, as well as the loss of the benefit of their bargain at the time they purchased or leased their Class Vehicles as described herein as a direct and proximate result of Nissan's misrepresentations about its express warranty.

### THIRD CAUSE OF ACTION
**Violation of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. §§ 407.010 *et seq*. ("the MMPA")**
**(Plaintiff Individually and on behalf of the Class)**

83.     Plaintiff, on behalf of herself and the proposed Class, hereby re-alleges the paragraphs above as if fully set forth herein.

84.     The Missouri Merchandising Practices Act ("the MMPA") provides that "[t]he act, use or employment by any person of any deception . . . [or] unfair practice, or the concealment . . . of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice."  Mo. Rev. Stat. § 407.020.1.

85.     The enabling regulations for the MMPA define an "unfair practice" as conduct that (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes a risk of substantial injury to consumers; (4) was not in good faith; (5) is unconscionable; or (6) is unlawful. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.

86.     Under the MMPA, the term "merchandise" is broadly defined to include "any objects . . . or services."  Mo. Rev. Stat. § 407.020.4. The Class Vehicles are "merchandise" within the scope of the MMPA.

87.     The MMPA authorizes private causes of action, and class actions.  Mo. Rev. Stat. §§ 407.025.1; 407.025.2. Plaintiff and members of the proposed Class are individuals entitled to bring suit and recover under the MMPA.

88.     When Nissan designed, developed, manufactured, marketed, and sold the Class Vehicles, it was involved in the conduct of trade and commerce under the MMPA.

89.     At the time Nissan developed, manufactured, marketed, and sold the Class Vehicles, it knew that they contained the Defect that posed serious safety risks to consumers like Plaintiff and Class members.

90.     Nonetheless, Nissan concealed its knowledge of the Defect from consumers like Plaintiff and Class members and instead sold Class Vehicles as safe for normal use.

91. The Defect created and continues to create serious safety risks, which were hidden from the consumers.

92. Nissan intentionally concealed the unreasonable safety risks associated with the defective Class Vehicles that were material facts to consumers like Plaintiff and Class members. No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the Defect.

93. Upon information and belief, in or around 2007 when Nissan changed the design of its vehicles to incorporate a change eliminating the Defect, it concealed the Defect of the earlier design from consumers including Plaintiff and Class members, failing to offer to repair or to remove the defective Class Vehicles from the stream of commerce even after attempting to remediate its own design errors.

94. Nissan did not recall the defectively designed Class Vehicles, nor did it notify consumers that the defective Class Vehicles could prematurely fail, were dangerous to occupants and should be replaced.

95. Nissan's intentional misrepresentations, omissions and concealments of material fact constitute unfair and/or deceptive practices in violation of the MMPA.

96. Nissan violated the MMPA not only when it sold the Class Vehicles representing them to be safe, but also when Nissan failed to disclose to Plaintiff and the Class members that the Class Vehicles had the Defect which would cause premature corrosion and failure of the floorboard. Nissan's conduct – its misrepresentations, omissions, and concealment – posed serious safety risks to consumers and the public.

97. Nissan violated the MMPA when it sold Class Vehicles that it knew were unsafe for ordinary and intended use, when it represented to the public that its Class Vehicles could be

used safely, and when it failed to warn consumers that the Class Vehicles contained the Defect that posed serious safety risks to consumers and the public.

98.     Nissan's deceptive practices, including but not limited to marketing of the Class Vehicles, were designed to induce Plaintiff and the Class members to purchase the Class Vehicles containing the Defect and to avoid the cost of replacing, repairing or retrofitting the defective Class Vehicles already in use by consumers throughout Missouri.

99.     Nissan's violations of the MMPA were designed to conceal, and Nissan failed to disclose material facts about the Defect and the unreasonable safety risks of the Class Vehicles in order to induce Plaintiff and the Class members to purchase Class Vehicles and to avoid the cost of recalling, replacing, repairing or retrofitting the Class Vehicles.

100.     Plaintiff and the Class members suffered injury-in-fact as a direct result of Nissan's violations of the MMPA in that they have purchased or leased Class Vehicles that pose an immediate safety risk and will have to be repaired or replaced.

101.     Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff and Class members would not have purchased the Class Vehicles or would have paid substantially less for them.

102.     Plaintiff and Class members have also been denied the use of their Class Vehicles, expended money on replacements, repairs, and damages to their Class Vehicles and suffered as a result of Nissan's conduct.

103.     To this day, Nissan continues to violate the MMPA by concealing the defective nature of the Class Vehicles by failing to issue a recall, by failing to notify customers of the serious safety issues posed by the Defect, and by failing to offer cost-free repair or replacement of the defective Class Vehicles to consumers.

104.    As a direct and proximate result of Nissan's unfair acts or practices alleged herein, Plaintiff and the Class members were damaged.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (Plaintiff Individually and on behalf of the Class)

105.    Plaintiff, on behalf of herself and the proposed Class, hereby re-alleges the paragraphs above as if fully set forth herein.

106.    Nissan had knowledge of the Defect and the serious safety risks it poses, which it failed to disclose to Plaintiff and the Class Members.

107.    As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the Defect in the Class Vehicles and the concealment of the Defect, Nissan obtained monies that rightfully belong to Plaintiff and the Class members to the detriment of the Plaintiff and the Class members.

108.    Nissan appreciated, accepted and retained the non-gratuitous benefits (i.e. profits) conferred by Plaintiff and the Class members who had no knowledge of the Defect.  Plaintiff and the Class members either paid a higher price for their Class Vehicles which actually had lower values, or paid Nissan monies for Class Vehicles that Plaintiff and the Class Members would not have purchased had they been aware of the Defect.

109.    It would be inequitable and unjust for Nissan to retain these wrongfully obtained profits.

110.    Nissan's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity, and good conscience.

111.    Plaintiff and the Class are entitled to restitution of the profits unjustly obtained, plus interest.

## FIFTH CAUSE OF ACTION
### Fraudulent Concealment
### (Plaintiff Individually and on behalf of the Class)

112.    Plaintiff, on behalf of herself and the proposed Class, hereby re-alleges the paragraphs above as if fully set forth herein.

113.    Nissan had a duty to disclose these safety, quality, dependability, and reliability issues because Nissan consistently marketed the Class Vehicles as safe for their normal and intended use.

114.    Once Nissan made representations to the public about safety, quality, dependability, and reliability, it was under a duty to disclose the existence of the Defect, because where one does speak one must speak the whole truth and not conceal any information that would materially qualify those facts stated. A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive constitutes fraud.

115.    Upon information and belief, in or around 2007 when Nissan changed the design of the Class Vehicles to eliminate problems arising from the Defect, it concealed the existence of the Defect in the earlier design from consumers including Plaintiff and Class members.

116.    When it remedied the Defect in the Class Vehicles, Nissan failed to publicize the fact that the Class Vehicles (which continued to be sold within its distribution networks) were known to prematurely corrode. Nissan also did not recall the defectively designed Class Vehicles, nor did it notify owners that the defective Class Vehicles could spontaneously rust through, or that it was a risk of serious harm and should be repaired or replaced.

117.    In addition, Nissan had a duty to disclose these omitted material facts because they were known and/or accessible only to Nissan, which has superior knowledge and access to

the facts, and Nissan knew they were not known to or reasonably discoverable by Plaintiff and the Class members.

118.     These omitted facts were material because they directly impact the safety, quality, and reliability of the Class Vehicles. Nissan possessed exclusive knowledge of the Defect and of quality control issues that rendered Class Vehicles inherently more dangerous and unreliable than similar automobiles.

119.     Nissan actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class members to purchase Class Vehicles at a higher price that did not match their true value.

120.     Nissan still has not made full and adequate disclosure of the existence of the Defect in Class Vehicles and continues to defraud Plaintiff and the Class Members.

121.     Plaintiff and the Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and the Class Members' actions in purchasing or leasing Class Vehicles were justified in light of their lack of knowledge.

122.     Nissan was in exclusive control of the material facts, and such facts were not known to Plaintiff or the Class members.

123.     As a result of the concealment and/or suppression of the facts, Plaintiff and the Class members sustained damage. Those Class members who want to rescind their purchase are entitled to restitution and consequential damages that arose from the sales transaction.

124.     Nissan's acts were done maliciously, deliberately, with intent to defraud, and/or in reckless disregard of Plaintiff's and the Class members' rights and well-being.

125.    Nissan's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, and Plaintiff and the Class members reserve the right to assert a claim for punitive damages upon satisfying the applicable statutory prerequisite pursuant to Missouri law.

## SIXTH CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*
### (Plaintiff Individually and on behalf of the Class)

126.    Plaintiff, on behalf of herself and the proposed Class, hereby re-alleges the paragraphs above as if fully set forth herein.

127.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

128.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301(1).

129.    Plaintiff is a "consumer" within the meaning of the MMWA, 15 U.S.C. §2301(3).

130.    Nissan is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

131.    Under 15 U.S.C. § 2310(d)(1), the MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

132.    Nissan provided all purchasers and lessees of Class Vehicles with an implied warranty, but breached this warranty as described in more detail above, including by selling and leasing Class Vehicles that are equipped with defective floorboards that are prone to rusting at a level that makes the vehicles unfit for the ordinary and intended purpose for which such vehicles are used.

35

133.    Nissan's breach of warranty has deprived Plaintiff and other Class members of the benefit of their bargain.

134.    As a direct and proximate result of Nissan's conduct, Plaintiff and other Class members have suffered damages and continue to suffer damages and other losses in an amount to be determined at trial.

135.    Plaintiff and each Class member has had sufficient direct dealings with either Nissan or its agents to establish privity of contract between Nissan and Plaintiff and each Class member. Nonetheless, privity is not required here because Plaintiff and each Class member is intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically, of Nissan's implied warranties. Nissan's warranty agreements were designed for and intended to benefit the Class.

136.    Privity also is not required because the Class Vehicles are dangerous instrumentalities due to the defect and nonconformities outlined herein.

137.    Affording Nissan a reasonable opportunity to cure its breach would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Nissan knew, should have known, or was reckless in not knowing of its misrepresentation concerning the Altimas' inability to perform as warranted, but nonetheless failed to rectify the situation or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure or afford Nissan a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

138.    Plaintiff and the Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Accordingly, Plaintiff and Class members have not re-accepted their Class Vehicles by retaining them.

139.    The amount in controversy of the Plaintiff's individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

140.    Plaintiff, individually and on behalf of the Class, seeks equitable relief, including rescission, and all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial, as well as attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter a judgment awarding the following relief:

    a.    An order certifying the proposed class and appointing Plaintiff and her counsel to represent the Class;

    b.    An order awarding Plaintiff and the Class members their actual damages, and/or any other form of monetary relief provided by and pursuant law;

    c.    An order awarding Plaintiff and the Class restitution, disgorgement or other equitable relief as the Court deems proper;

    d.    An order requiring Nissan to adequately disclose and repair the Defect;

    e.    An order awarding Plaintiff and the Class pre-judgment and post-judgment interest as allowed under the law;

f.      An order awarding Plaintiff and the Class reasonable attorney fees and costs of suit, including expert witness fees; and

g.      An order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED: May 8, 2017               Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Matthew L. Dameron*

Matthew L. Dameron (MO Bar No. 52093)
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:    (816) 945-7135
Facsimile:    (816) 945-7118
matt@williamsdirks.com

-and-

Norman E. Siegel (MO Bar No. 44378)
Sean R. Cooper (MO Bar No. 65847)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:    (816) 714-7100
Facsimile:    (816) 714-7101
siegel@stuevesiegel.com
cooper@stuevesiegel.com

-and-

Tim E. Dollar (MO Bar No. 33123)
J.J. Burns (MO Bar No. 64758)
**DOLLAR BURNS & BECKER**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:    (816) 876-2600
Facsimile:    (816) 221-8763
timd@dollar-law.com

jjb@dollar-law.com

*Counsel for Plaintiff and the Class*