# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

LAURA FRANCES HAYS, on behalf of  )
herself and all others similarly situated, )
                               )
          Plaintiff,         )
                               )
     v.                  )      Case No. 4:17-CV-00353-BCW
                               )
NISSAN NORTH AMERICA, INC.,    )
                               )
          Defendant.       )

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
## AND SUGGESTIONS IN SUPPORT THEREOF

DATED:      October 12, 2018        Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**
Matthew L. Dameron  MO Bar No. 52093
Amy R. Jackson       MO Bar No. 70144
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:        (816) 945-7110
Email:            matt@williamsdirks.com
                amy@williamsdirks.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel    MO Bar No. 44378
Toji Calabro        MO Bar No. 66574
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:        (816) 714-7100
Email:            siegel@stuevesiegel.com
                calabro@stuevesiegel.com

*Additional Counsel Listed on Signature Page*

*Counsel for Plaintiff and the
Proposed Class*

**SUBMITTED UNDER SEAL**

# TABLE OF CONTENTS

**STATEMENT OF FACTS** ................................................................................................. 1

**LEGAL STANDARD** ...................................................................................................... 8

**ARGUMENT** .................................................................................................................... 9

   **I.   PLAINTIFF'S CLAIMS SATISFY RULE 23(A).** ...................................................... 9

      *A.   The Class Satisfies Numerosity.* ...................................................................... 9

      *B.   Common Questions of Law or Fact Will Govern the Litigation.* ................... 10

      *C.   Plaintiff's Claims are Typical.* ...................................................................... 11

      *D.   Plaintiff and Her Counsel Will Adequately Represent the Class.* ................ 12

   II.   THE CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(3). .......................... 13

      *A.   Questions of Law or Fact Common to All Class Members Predominate.* ..... 13

         1.   Liability is Subject to Class-Wide Determination. ..................................... 14

         2.   Damages Can Be Determined on a Class-Wide Basis. ............................... 16

      *B.   Class Treatment is the Superior Method for Adjudicating These Claims.* ..... 16

   III.   THE PROPOSED CLASS IS ASCERTAINABLE. .................................................... 18

   IV.   IN ADDITION, OR ALTERNATIVELY, RULE 23(C)(4) ISSUE CERTIFICATION IS WARRANTED 19

**CONCLUSION** ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525 (8th Cir. 1996) ................................... 12

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................... 12, 13

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) .......................... 9, 13

*Ark. Educ. Ass'n v. Bd. Of Educ.*, 446 F.2d 763 (8th Cir. 1971) ................................. 10

*Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010) ................................ 13

*Backer Law Firm v. Costco Wholesale Corp.*, 321 F.R.D. 343 (W.D. Mo. 2017) ...................... 18

*Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-04321-NKL, 2013 WL 3872181 (W.D. Mo. July 25, 2013) ................................. 17

*Bennett v. Nucor Corp.*, 656 F.3d 802 (8th Cir. 2011) ................................. 8

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ................................. 13

*Bradford v. AGCO Corp.*, 187 F.R.D. 600 (W.D. Mo. 1999) ..................................... 10

*Butler v. Sear, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ................................. 19, 20

*Byrd v. Aaron's, Inc.*, 784 F.3d 154 (3d Cir. 2015) ..................................... 18

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................. 19

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................... 8

*Cooper v. Integrity Home Care, Inc.*, No. 4:16-CV-1293-DGK, 2018 WL 3468372 (W.D. Mo. July 18, 2018) ................................. 17

*Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544 (W.D. Mo. 2017) ................................. 9, 10, 11, 16

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007) ......... 19

*Cromeans v. Morgan Keegan & Co., Inc.*, 303 F.R.D. 543 (W.D. Mo. 2014) ...................... 10, 16

*Day v. Celadon Trucking Servs., Inc.*, 827 F. 3d 817 (8th Cir. 2016) ......................... 13

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ........................................................ 11

*Doran v. Missouri Dep't of Soc. Servs.*, 251 F.R.D. 401 (W.D. Mo. 2008) ................................. 11

*Dumas v. Albers Medical, Inc.*, No. 03-640, 2005 WL 2172030 (W.D. Mo. Sept. 7, 2005) ....... 18

*Flynn v. FCA US LLC*, No. 15-855, 2018 WL 3303267 ...................................................... 10, 15

*Gunnels v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003) ................................................ 19

*In re Aquila ERISA Litig.*, 237 F.R.D. 202 (W.D. Mo. 2006) ...................................................... 11

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 312 F.R.D. 332 (S.D.N.Y. 2015) ................ 18

*In re McDonnell Douglas Corp. Secs. Litig.*, 98 F.R.D. 613 (E.D. Mo. 1982) ........................... 13

*In re Motor Fuel Temp. Sales Practices Litig.*, 292 F.R.D. (citing cases) ................................... 20

*In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263 (D. Kan. 2010) .............. 18

*In re St. Jude Medical, Inc.*, 522 F.3d 836 (8th Cir. 2008) .......................................................... 19

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2010) ................................................. 16

*In re Whirlpool*, 722 F.3d 838 (6th Cir. 2013) ............................................................................ 20

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) .................................. 9

*Keegan v. American Honda Motor. Co., Inc.*, 284 F.R.D. 504 (C.D. Cal. 2012) ........................ 15

*M.B. by Eggemeyer v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 3484048 (W.D. Mo. July 19,

2018) ................................................................................................................................ 11

*McKeage v. TMBC, LLC*, 847 F.3d 992 (8th Cir. 2017) ............................................................. 18

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) .................................................... 17

*Nelson v. Wal-Mart Stores, Inc.*, 245 F.R.D. 358 (E.D. Ark. 2007) ...................................... 19, 20

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) ................................................................ 14

*Paxton v. Union Nat'l Bank*, 688 F.2d 552 (8th Cir. 1982) ................................................... 10, 12

*Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679 (S.D. Fla. 2014) .............................................. 18

*Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529 (S.D. Fla. 2015) ........................................ 15

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016) ....................... 18

*Tyson Foods, Inc.*, 136 S. Ct. ........................................................................................ 14, 15, 16

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................................ 10

*Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010) ..................... 15

**Rules**

Fed. R. Civ. P. 23(c)(4) ............................................................................................................ 19, 20

Fed. R. Civ. P. 23(g) ....................................................................................................................... 20

Fed. R. Civ. P. 30(b)(6) .................................................................................................................... 1

Federal Rule of Civil Procedure 23 ............................................................................................ 8, 9

Rule 23(a) ..................................................................................................................................... 8, 9

Rule 23(a)(1) .................................................................................................................................... 10

Rule 23(a)(2) .............................................................................................................................. 10, 11

Rule 23(a)(3) .................................................................................................................................... 11

Rule 23(a)(4) .................................................................................................................................... 12

Rule 23(b) .......................................................................................................................................... 8

Rule 23(b)(3) ........................................................................................................................ 9, 13, 19

Rule 23(c)(4)(A) ............................................................................................................................... 19

**Other Authorities**

1938 All Over Again? Pretrial as Trial in Complex Litigation, 60 DEPAUL L. REV. 647 (2011)

........................................................................................................................................................ 19

This case concerns a series of defects in vehicles produced and sold by Nissan. Nissan has known about the defects since at least 2006, but took no action to protect or assist consumers until 2015 – nearly a decade later – and only after it faced negative nationwide publicity and litigation. Even then, Nissan's "remedy" was to quietly issue a repair bulletin with no notice to consumers, and shift the entire cost to vehicle owners. This Motion seeks class certification for those owners and consumers under Rule 23, and the Court should grant Plaintiff's Motion.

## STATEMENT OF FACTS

### *Overview of Class Vehicles*

1.      Nissan North America sold two models of vehicles at issue in this litigation: 2002-2006 Altimas, and 2004-2008 Maximas. These models were designed and manufactured with the exact same defects and are collectively the "Class Vehicles."

2.      As used in Nissan's documents, the term "L31" refers to the Altimas contained within the definition of Class Vehicles (model years 2002-2006). *See* Exhibit 1 (Deposition of Steven Miller) at 36:12-15.[1] Altimas within the scope of the Class Vehicles were manufactured from June 2001 through April 2007. *Id.* at 93:1-3; 114:1 to 115:7.

3.      As used in Nissan's documents, the term "A34" refers to Maximas contained within the definition of Class Vehicles (model years 2004-2008). Ex. 1 at 36:16-18. Maximas within the scope of the Class Vehicles were manufactured from December 2002 through May 2008. *Id.* at 93:15-17; 115:9-13.

4.      Nissan treated the problem with the L31 Altimas and the A34 Maximas the same and made no distinctions between the vehicles in its analysis of the defects. Exhibit 2 at NNA3582; Ex. 1 at 109:10 to 110:25.

---

[1]      Nissan designated Steven Miller as its corporate representative under Fed. R. Civ. P. 30(b)(6).

5.      For a brief time period, Nissan manufactured some of the Class Vehicles at two locations in the United States. But the company did not "detect any difference between the rate of incidents" and there was "no discernable difference" between Class Vehicles manufactured at one plant compared to the other. Ex. 1 at 68:10 to 69:3.

6.      In fact, Nissan documents reveal that the defects applied to "[a]ll production for L31 Altima and A34 Maxima" which was approximately 1.7 million Class Vehicles. Ex. 2 at NNA3582; Ex. 1 at 114:19-21. As of January 2015, there were at least 12,000 Class Vehicles operating in the state of Missouri. Exhibit 3 at NNA5206.

*Class Vehicles Experience Significant Rust and Corrosion.*

7.      Class Vehicles experience corrosion in the floor pan under the front driver and passenger cabins. Exhibit 4 at NNA3588 (Slide 4); Ex. 1 at 119:10-17 (indicating corrosion in both sides of the floor pan).

8.      According to Nissan's internal analysis, the corrosion rate in Class Vehicles in salt states is potentially 90% or higher. Ex. 4 at NNA3587 (Slide 3); Exhibit 5 at NNA1613.

9.      Missouri is one of the most severe "salt states in the country." Ex. 1 at 103:7-8; 231:15 to 232:-4; Ex. 4 at NNA3603; Exhibit 6 at NNA5025 ("repairstate" tab).

10.     The defects in the Class Vehicles are latent. *See* Exhibit 7 at p. 9. Indeed, Nissan's internal documents provide that: "we assume customer could not [be] aware [of] this use until floor pan hole" materializes, and Nissan does not "expect[] customers to do floor inspections on their vehicles." *See* Exhibit 8 at NNA4075; Ex. 1 at 179:23-25.

11.     Going forward, Nissan would expect to continue to see a 90% incident rate in salt state areas. Ex. 1 at 189:12 to 190:14. Indeed, the longer the Months In Service, the probability of

rust to the point of perforation increases to over 90% in Class Vehicles. *See* Exhibit 9 at NNA5019

(Logistic Regression forecast: Probability of perf); Ex. 1 at 223:9 to 224:9.

### *The Rust is a "Direct Consequence" of Nissan's Design*

12.     The front floor pans of Class Vehicles have two floor layers. Ex. 1 at 48:4-19. Each

floor layer has a "tooling hole" that was used only for "location and movement of the floor pan

during assembly at the manufacturing facility." Ex. 1 at 49:9 to 50:5. The hole had no structural

purpose. *Id.*

13.     Nissan used a butyl patch to cover the holes in the floor layers. This design – a two-

layer floor pan with holes covered by a butyl patch – was a "unique floor assembly structure" to

the Class Vehicles. Ex. 1 at 117:5 to 118:2; Ex. 2 at NNA3582. "It affected all L31 and A34s, but

no other Nissan model," including other generations of Altimas and Maximas. *Id.*

14.     The corrosion in the Class Vehicles "started from the hole area" that was covered

by the defective butyl patch. Ex. 1 at 56:14-22. Nissan "expected" the rust to emanate from the

hole area. *Id.* at 57:13-17. Nissan is unable to identify any other area from which the rust would

emanate, and the company's investigation did not find rust emanating from any other locations on

the Class Vehicles. Ex. 1 at 57:18 to 58:3.

15.     Nissan used the same butyl patches to cover holes in other areas of Class Vehicles

that did not have two floor layers, and Nissan found no rust or corrosion in those areas. Ex. 1 at

119:24 to 120:21.

16.     Expert analysis confirms that Nissan's design of the floor pans caused or

contributed to the rust and corrosion in Class Vehicles. *See* Ex. 7 at p. 9 (the corrosion "is a direct

consequence of the design and fabrication of this particular area of the floor pan").

17. According to Kasbekar, the floor pan "design is not only unique to the class vehicles but the dual layer design was not reasonably accounted for by Nissan and to the best of my knowledge a butyl patch was never previously used in such a dual layer configuration and does not appear to be intended for use in such an application . . ." Ex. 7 at p. 9.

18. Indeed, Kasbekar analyzed the design of vehicles comparable to Class Vehicles and noted that other manufacturers do not use a butyl patch, and instead "typically use more robust polymer plugs or other robust positive seals to prevent moisture intrusion." Ex. 7 at p. 10 (displaying floor pan photographs of a 2003 Toyota Corolla, a 2002 Volkswagen Golf, and a 2009 Nissan Altima). Kasbekar confirms that the polymer plug and other sealing technologies "were technologically feasible and in use prior to the manufacture" of the Class Vehicles. *Id.* at p. 10.

19. Nissan admits that consumers did not do anything to contribute to the rust or the degree of rust, and that "there was no indication" that consumers' use of the vehicles contributed to the problem. Ex. 1 at 354:5-16.

### The Rust Is A Result of Nissan's Defective Design and Manufacturing

20. In its own analysis, Nissan attributed rust and corrosion in Class Vehicles to the cars' "unique floor assembly structure" and its defective manufacturing. The company's internal investigation reported:

Water and salt can enter between floor panels through a hole in the floor assembly. This occurred due to insufficient sealing. A butyl patch on the FR Floor was not pressed down sufficiently during the manufacturing process. This may allow water and salt to become captured between the two floor panels.

*See* Ex. 5 at NNA1614. The term "FR Floor" refers to "front floor." Ex. 1 at 43:16-18; Ex. 4 at NNA3588 (Slide 4) ("[i]mproper application of the butyl patch on the inner side of the floor assembly caused an insufficient seal condition").[2]

21. As recently as late September 2018, Nissan continued to consider this the "root cause of the problem." Ex. 1 at 44:11-14; 50:7-18 (Nissan still believes that "manufacturing did not diligently press down the butyl patch on the floor to seal the edge of both panels").

22. The butyl patch was applied by hand. Ex. 1 at 52:6-10. But Nissan did not provide instructions to its manufacturing workers about how to apply the patch on Class Vehicles "to ensure a seal with respect to the double-layered panel." Ex. 1 at 89:3 to 90:7; Ex. 4 at NNA3595 (Slide 11) ("There is no clear instruction of double layer panel.").

23. Kasbekar confirms Nissan's findings. He states, "there does not appear to be any reasonable procedures, instructions, or standard methods used by Nissan to apply the butyl patch." Ex. 7 at p. 13.

24. But even if the patch was installed correctly, it was defective. According to Kasbekar, "[t]he butyl patch seal design which lacks adequate contact to insure proper adhesion, can also be affected by residual forces and external forces that will tend to pull the patch upward and away from the hole it is attempting to seal. At this time, I am unaware of any procedures or test data that shows the butyl patch utilized by Nissan could effectively maintain a reliable watertight seal." Ex. 7 at p. 13. Thus, even if the patch is applied effectively, other conditions of the butyl patch render it ineffective at maintaining a seal and keeping moisture out of the floor layers of Class Vehicles.

---

[2] A "butyl patch" is "a patch that is used for sealing in the paint and body process." Ex. 1 at 36:23 to 37:2.

***Despite Design and Manufacturing Defects, Nissan Refused to Assist Vehicle Owners***

25.     Nissan knew about the defects in Class Vehicles as early as September 2006 when a Nissan affiliate issued a Technical Report. Ex. 4 at NNA3596 (Slide 12) ("History of this concern").[3] The September 2006 Technical Report was opened on September 8; Nissan closed it the same day. *Id.*

26.     Between 2006 and 2011, Nissan took no steps to notify consumers about the problem, conduct repairs of the problem, or further its investigation. *Id.* By its own admission, Nissan resumed its investigation only <u>after</u> the NHTSA opened an unofficial inquiry into the rust in Class Vehicles. *Id.*

27.     As part of its investigation, Nissan determined that the defects resulted in "[h]igh customer dissatisfaction issue in Canada and US salt area." Nissan's design engineers developed a "recommended" process to repair the defects, which required cutting out the rusted floor plan and replacing it. *See* Exhibit 10 at Slide 15; Exhibit 11; Ex. 1 at 100:15-18.

28.     Customers paid, on average, between $3,000 and $4,600 for this repair, even though the actual cost of parts and labor to do the repair was approximately $1,400. Ex. 10 at Slide 16; Exhibit 12 at NNA4448; Ex. 1 at 100:19 to 101:4; 271:20 to 272:10. Nissan considered repairing all Class Vehicles, but elected not to do so after estimating that it would cost $749 million. Ex. 10 at Slides 2, 16-17.

29.     Nissan began developing a "cost effective repair method." Ex. 10 at Slide 2. Instead of replacing the rusted floor pans, Nissan proposed simply covering them up with a patch. The cost of this option was significantly less: approximately $400. Ex. 4 at NNA3598 (Slide 14).

---

[3]     A Technical Report is a report from Nissan's Technical Service Managers (TSMs). Ex. 1 at 73:3-8. TSMs "file reports on concerns when a customer comes to the dealer, specifically, for issues that maybe aren't covered under warrant." *Id.*

Nissan also considered various ways to defray the cost of this less expensive repair: (1) Option 1 contemplated a two-year time period with a proactive notice campaign to owners of Class Vehicles wherein consumers would pay a deductible of $200 with Nissan paying the remaining balance of the repair cost; (2) Option 2 contemplated a two-year time period with a warranty extension, but no proactive notice campaign to consumers; and (3) Option 3 contemplated a Transportation Safety Bulletin (TSB) wherein the owner of the Class Vehicle would pay the entire repair cost, estimated to be between $500 and $600. *See e.g.* Ex. 4 at NNA3589 (Slide 5). Nissan's Field Quality Assurance ("FQA") group, the group responsible for recalls and service campaigns, recommended Option 1. Ex. 1 at 25:19-26:7; Ex. 4 at NNA3589 (Slide 5).

30.     Nevertheless, in October 2014, "Nissans upper management [] made a business decision to not continue with this repair or provide a service part." Exhibit 13 at NNA1625; Ex. 1 at 319:4-15. Nissan decided to take no action at all and closed the file. *Id.*; Ex. 2 at NNA3582 ("Proposed field action": "Close").

31.     Shortly thereafter, in March 2015, social media and NBC news began publicizing the corrosion problem with the Class Vehicles. Ex. 12 at NNA4446-47. By May 2015, Nissan began reviewing its options again. Exhibit 14 at p. 6 ("3. Option").

32.     This time, when considering its options, Nissan explicitly contemplated that doing nothing but making a part available for purchase would not decrease the corrosion risk, and would "[i]ncrease the class action risk if the customer[s] feel dissatisfaction," but this option would "[d]ecrease the campaign cost to Nissan in [the] short term" and provide Nissan with cover: "Nissan can excuse that we offer[ed] the suitable repair method." Exhibit 15 at p. 5 ("3. Option"); *see also* Exhibit 16 at p. 5 ("3. Option"). With eyes wide open, Nissan chose this option.

33.     Nissan issued its TSB for all Class Vehicles in July 2015. *See* Exhibit 17 at NNA1701. Nissan did not authorize the production of the repair parts called for in the TSB until July 2015. *Id.*; Ex. 1 at 276:16 to 277:4. Thus, to the limited extent Nissan took action to create a repair for the rust, it did not do so until <u>after</u> negative news coverage associated with the condition.

34.     Nissan also did not act until consumers filed litigation related to the rust. The first lawsuit concerning the rust was filed in the Northern District of California on April 6, 2015 – months before Nissan issued its TSB or even authorized the repair part.[4]

35.     Nissan's TSB applied uniformly to all Class Vehicles; it contemplated a uniform repair for all the vehicles, regardless of model, age, mileage, or condition. *See* Ex. 17 (making no distinction among Class Vehicles); Ex. 1 at 294:8-17 (TSB applies equally to Altima and Maxima vehicles).

36.     Using the repair costs associated with the defects, damages to the Class Vehicles are susceptible to class-wide calculation and treatment. *See* Exhibit 18.

37.     Like Class members, Plaintiff owned a Class Vehicle. Complaint at ¶ 47. Plaintiff paid approximately $460 to repair the rust in the front floor pans of her Class Vehicle. *Id.* at ¶ 53.

## LEGAL STANDARD

Class certification is governed by Federal Rule of Civil Procedure 23, which requires that a class action satisfy the four prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). A district court "must undertake a 'rigorous analysis' to ensure that the requirements of Rule 23 are met." *Bennett v. Nucor Corp*., 656 F.3d 802, 814 (8th Cir. 2011). However, "there are limits to a court's analysis of the merits of a matter at the class certification stage. A court's inquiry on a motion for class certification is

---

[4]     *Grimm v. Nissan North America, Inc.*, Case No. 15-CV-01571 (N.D. Cal.) (filed April 6, 2015).

'tentative,' 'preliminary,' and 'limited.'" *Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 551 (W.D. Mo. 2017) (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)). Indeed, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455 (2013)). In this case, the proposed Class meets all the requirements of Rule 23(a) as well as the requirements of Rule 23(b)(3) and, therefore, should be certified.

## ARGUMENT

In this case, Plaintiff seeks certification under Rule 23 of the following Class:

> **All persons in the State of Missouri who (1) currently own or lease a Class Vehicle, or (2) who previously paid for repairs to rust in a front floor pan of a Class Vehicle.[5] Class Vehicles include model years 2002-2006 Nissan Altimas and model years 2004-2008 Nissan Maximas.**

The proposed Class conforms to the discovery that has occurred to date. Nissan's internal documents and its corporate deposition testimony confirm that the Class Vehicles had the same design for floor pans, were manufactured in the same manner, experienced rust in the same areas, and were treated the same by Nissan in evaluating the defects and potential solutions.

## I. Plaintiff's Claims Satisfy Rule 23(a).

### A. The Class Satisfies Numerosity.

---

[5] Excluded from the proposed Class is Nissan; any affiliate, parent, or subsidiary of Nissan; any entity in which Nissan has a controlling interest; any officer, direct, or employee of Nissan; any successor or assign of Nissan; anyone employed by counsel for Plaintiff in this action; any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; members of the judge's staff; and anyone who purchased a Class Vehicle for the purpose of resale.

Rule 23(a)(1) requires that the class be sufficiently numerous such that joinder of all members would be impracticable. "In considering this requirement, courts examine the number of persons in the proposed class and factors such as the nature of the action, the size of the individual claims, and the inconvenience of trying the individual claims." *Cromeans v. Morgan Keegan & Co., Inc.*, 303 F.R.D. 543, 551 (W.D. Mo. 2014) (citing *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982)). "The Eighth Circuit has not set forth an arbitrary number or arbitrary rules regarding numerosity." *Bradford v. AGCO Corp.*, 187 F.R.D. 600, 604 (W.D. Mo. 1999). And "[w]hen the question of numerosity is a close one, courts tend to strike a balance in favor of finding numerosity." *Cromeans*, 303 F.R.D. at 551.

Here, the proposed Class is sufficiently numerous. As of January 2015, over 12,000 Class Vehicles were operating in the state of Missouri. *See* SOF at ¶ 6. This represents just a portion of the Class Vehicles, and easily satisfies the minimum threshold for establishing numerosity.[6]

**B.    Common Questions of Law or Fact Will Govern the Litigation.**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." A plaintiff must show that the claims "'depend upon a common contention' that 'is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Cromeans*, 303 F.R.D. at 552 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "[A] single common contention" is sufficient. *Flynn v. FCA US LLC*, No. 15-855, 2018 WL 3303267, --- F.R.D. ---, at *10 (S.D. Ill. July 5, 2018) (citing *Dukes*, 564 U.S. at 359). But commonality "does not require that every question of law or fact be common to every member of the class ... and may be satisfied,

---

[6]    The Eighth Circuit and this Court have found much smaller classes to satisfy the numerosity requirement. *See, e.g.*, *Ark. Educ. Ass'n v. Bd. Of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971) (a proposed class of 20 members satisfied numerosity); *Paxton*, 688 F.2d at 561 (8th Cir. 1982) (finding a class of 74 employees satisfied numerosity); *Cope*, 319 F.R.D. at 554-55 (certifying classes of 99 and 144 members).

for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *M.B. by Eggemeyer v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 3484048, at *5 (W.D. Mo. July 19, 2018) (citations omitted). For this reason, "[c]ommonality is easily satisfied in most cases." *Id.*

The proposed Class satisfies Rule 23(a)(2)'s commonality requirement. While only one common question of law or fact is required, this case has many, including:

- whether Nissan's design of the Class Vehicles was defective;

- whether Nissan's fabrication and manufacture of the Class Vehicles was defective;

- whether the alleged defects constituted a safety defect;

- whether Nissan knew about the defects and was obligated to notify consumers; and

- whether Nissan's conduct violated Missouri law as alleged in the Complaint.

Each of the foregoing questions is common to the Class because they will be answered by scrutinizing Nissan's conduct in relation to the Class Vehicles rather than the conduct of the individual Class members. *See Doran v. Missouri Dep't of Soc. Servs.*, 251 F.R.D. 401, 404 (W.D. Mo. 2008) (observing that the commonality inquiry focuses on the defendant's conduct) (citing cases). Accordingly, Plaintiff has satisfied the low burden to demonstrate commonality exists.[7]

### C. Plaintiff's Claims are Typical.

Rule 23(a)(3)'s typicality requirement "is fairly easily met, so long as other class members have claims similar to the named plaintiff." *Cope*, 319 F.R.D. at 555 (citing *DeBoer v. Mellon Mortg. Co*., 64 F.3d 1171, 1174 (8th Cir. 1995). In assessing typicality, courts consider whether the named plaintiff's claim "arises from the same event or course of conduct as the class claims,

---

[7]    *See, e.g.*, *In re Aquila ERISA Litig.*, 237 F.R.D. 202, 207 (W.D. Mo. 2006) ("[The commonality] requirement imposes a ***light burden*** on the plaintiff seeking class certification and does not require commonality on every single question raised in a class action.") (emphasis added).

and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

The typicality requirement is satisfied here because Plaintiff asserts the same claims individually that she asserts on behalf of the Class, and she suffered the same injury as unnamed Class members, i.e., she owned a Class Vehicle and paid for repairs to it. Complaint at ¶¶ 47; 53. Thus, her claim "arises from the same event of practice or course of conduct" as the rest of the Class. *Alpern*, 84 F.3d at 1540. Because Plaintiff's claims are indistinguishable from those of the Class, typicality is satisfied.

### D. Plaintiff and Her Counsel Will Adequately Represent the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (internal citation omitted). The focus is on whether (1) the class representatives have common interests with class members, and (2) the class representatives will vigorously prosecute the interests of the other class members through qualified counsel. *Paxton*, 688 F.2d at 562-63.

Here, Plaintiff has no interest that is antagonistic to, or conflicts with, the interests of the Class. To the contrary, Plaintiff's interests are coextensive of those of the proposed Class members in establishing Nissan's liability and damages.

Further, Plaintiff has retained qualified attorneys who are experienced in class action litigation. Class Counsel have extensive experience in handling matters related to consumer protection, including prosecuting such cases via the class action device under federal law. The lawyers at Stueve Siegel Hanson and Williams Dirks Dameron have also successfully prosecuted class actions involving vehicle defects against General Motors (defective coolant), Hyundai

(defective flywheels), Mitsubishi (defective wheel rims) and Volkswagen (defective window regulators). Class Counsel also have a track record of successfully litigating claims in this Court under Missouri law. Additionally, Class Counsel have a track record of working together and collaborating for the benefit of their clients.[8] Accordingly, Plaintiff satisfies adequacy.

## II.     The Class Satisfies the Requirements of Rule 23(b)(3).

The party seeking certification must also satisfy at least one of the provisions of Rule 23(b). Here, Plaintiff moves for certification pursuant to Rule 23(b)(3); Plaintiff's proposed Class satisfies both the "predominance" and "superiority" requirements of Rule 23(b)(3).

### A.     Questions of Law or Fact Common to All Class Members Predominate.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. It does not require that each element of the plaintiff's claims be susceptible to class-wide proof. *Amgen*, 568 U.S. at 469. It also does not require that the common questions will be answered, "on the merits," in favor of the class. *Id.* at 459-60.

Rather, when determining whether common questions predominate, the court asks whether, if the plaintiff's general allegations are true, common evidence could suffice to make out a prima facie case for the class. *See Blades v. Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010).[9] And, importantly, when there are issues common to the class that predominate, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Day v. Celadon Trucking*

---

[8]     *See* Exhibits 19-21 (firm resumes for proposed Class Counsel).

[9]     *See also In re McDonnell Douglas Corp. Secs. Litig.*, 98 F.R.D. 613, 616 (E.D. Mo. 1982) ("[I]n determining whether common questions predominate, courts focus on the liability issues.").

*Servs., Inc.*, 827 F. 3d 817, 833 (8th Cir. 2016) (internal citation omitted). "Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (internal citation omitted). Plaintiff's claims should be prosecuted on a class-wide basis because common evidence will establish both liability and the appropriate measure of damages on behalf of all Class members.

### 1. *Liability is Subject to Class-Wide Determination.*

Common questions predominate in establishing Nissan's liability. When assessing predominance, "[a] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc.*, 136 S. Ct. at 1045.

Here, the same evidence will govern threshold questions in the litigation, such as whether Nissan's design and manufacture of the Class Vehicle was defective; whether the defects associated with the Class Vehicles invoked safety concerns; and whether Nissan violated its duties to consumers related to the Class Vehicles, including whether Nissan concealed the defects from consumers. The disposition for all of these questions will focus exclusively on Nissan and its conduct – evidence that is equally applicable to the entire Class. Much of that evidence is already available in the form of internal analyses concerning rust in the Class Vehicles (*see* SOF at ¶¶ 1-11; 20-22), and other documents concerning the company's response to the defective Class Vehicles (*see* SOF at ¶¶ 27-35).

For example, Nissan evaluated the rust problem for all Class Vehicles in a uniform way, including a uniform analysis for Altima and Maxima vehicles. *See e.g.*, SOF at ¶¶ 20-22; 25-35 (analyzing rust problem for Altimas and Maximas the same). Nissan's evaluation about the cause

and effect of the rust problem yielded the same conclusions for all Class Vehicles, i.e., that all Class Vehicles are afflicted with the same defects and those defects manifest in the same manner. *See e.g.*, SOF at ¶¶ 20-22 (concluding that the butyl patch was the cause of the rusting, and rusting occurred similarly for all Class Vehicles). Finally, Nissan implemented the same remedial program for all Class Vehicles; the TSB issued by Nissan applied to all Class Vehicles and endeavored to impose a uniform repair. *See* SOF at ¶¶ 33; 35 (Nissan TSB applying to all Class Vehicles). In this respect, any evidence concerning individual claims would be subject to the same evidence; plaintiffs in disparate, individualized litigation would look to and rely on the same evidence to support their individual claim.

Notably, <u>none</u> of Nissan's documents that analyzed the rust problems attributed any causation to individual consumers or their driving habits. *See* SOF at ¶ 19. Nissan's corporate representative confirmed what is apparent from the contemporaneous documents – that consumers did not do anything to contribute to the rust or the degree of rust, and that "there was no indication" that consumers' use of the vehicles contributed to the problem. *Id.* Thus, by Nissan's own admission, the common questions identified above will not focus on consumers or their conduct, but exclusively on Nissan's conduct.

In this respect, Plaintiff's claims are analogous to other cases where a consumer alleges an automobile design or manufacturing defect (both of which are present here).[10] Because liability in

---

[10]     *See Keegan v. American Honda Motor. Co., Inc.*, 284 F.R.D. 504, 524 (C.D. Cal. 2012) (approving class certification in case concerning defective rear suspension where "[t]he claims of all prospective class members involve the same alleged defect, covered by the same warranty, and found in vehicles of the same make and model") (internal citations omitted); *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1176 (9th Cir. 2010) (reversing trial court's denial of class certification for claim concerning alignment geometry defect); *Flynn*, 2018 WL 3303267 (approving class certification against vehicle manufacturer concerning alleged design defects); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529 (S.D. Fla. 2015) (granting class certification against vehicle manufacturer concerning alleged defect that allowed exhaust to enter the passenger compartment).

this case is subject to uniform evidence of Nissan's conduct, Plaintiff's claims satisfy predominance.

### 2. *Damages Can Be Determined on a Class-Wide Basis.*

The Supreme Court dictates that proof of class-wide damages is ***not*** a prerequisite to class certification.[11] Rather, a plaintiff need only "show a linkage between [their] theory of liability and theory of damages." *Cromeans*, 303 F.R.D. at 559. Expert testimony establishing common impact from the defendant's conduct is sufficient to establish class-wide injury. *See, e.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1259 (10th Cir. 2010). In this case, the fact that Plaintiff can establish damages for each Class member through common evidence further supports certification.

Plaintiff submits the expert declaration of Edward Stockton from the Fontana Group. *See* Ex. 18; SOF at ¶ 36. Stockton opines that using the methodology set forth in his Declaration he can (1) calculate damages for current owners and lessees of Class Vehicles based on the repair costs associated with the rusting defects, and (2) extrapolate that calculation to the remaining members of the Class. *Id.* Thus, because the Class damages are susceptible to common proof, Plaintiff satisfies the predominance requirement.

### B. Class Treatment is the Superior Method for Adjudicating These Claims.

In addition to predominance, Rule 23(b)(3) contemplates that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." The superiority analysis "requires the Court to determine whether the class action is manageable, taking into consideration choice of law determinations, notice to class members, etc." *Cope*, 319 F.R.D. at 557. "[D]ismissal for management reasons is never favored….[and] lack of manageability justifies

---

[11]     *Tyson Foods, Inc.*, 136 S. Ct. at 1045 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, ***such as damages*** or some affirmative defenses peculiar to some individual class members.'") (internal citations omitted) (emphasis added).

denial of certification 'only where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class.'" *Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-CV-04321-NKL, 2013 WL 3872181, at *15 (W.D. Mo. July 25, 2013) (citations omitted).[12]

Again, because this case focuses on Nissan's conduct in devising a design and manufacturing defect that was uniform across all Class Vehicles, and challenges Nissan's conduct in concealing those defects, a class action is just as manageable as a single plaintiff case. This is particularly true considering the absence of any choice-of-law concerns; the case is limited in scope to Missourians and it will not implicate the laws of several states.

Moreover, notice can be efficiently distributed to protect the Class members' due process rights. This Court has held that notice satisfies due process when it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Cooper v. Integrity Home Care, Inc*., No. 4:16-CV-1293-DGK, 2018 WL 3468372, at *5 (W.D. Mo. July 18, 2018) (internal citation omitted). The parties will engage a settlement administrator to facilitate notice to Class members, thereby easily satisfying this notice standard.

Finally, consolidating the claims of all Missourians with Class Vehicles into one litigation would be in the best interest of the Class members and the court system. Indeed, it would be judicially inefficient for these claims to be spread among multiple jurisdictions, particularly where the same legal theories and evidence will be used by all Class members. Class counsel will be able

---

[12]    *See also Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015) (noting it is a "well-settled presumption" that "courts should not refuse to certify a class merely on the basis of manageability concerns") (citing cases).

to present this case on a class-wide basis as efficiently as on an individual basis, and in less time than prosecuting multiple claims in different jurisdictions.

## III.  The Proposed Class Is Ascertainable.

In addition to meeting the requirements of Rule 23(a) and 23(b), a proposed class "must be adequately defined and clearly ascertainable." *Backer Law Firm v. Costco Wholesale Corp*., 321 F.R.D. 343, 346 (W.D. Mo. 2017)*.* The Eighth Circuit has rejected a heightened ascertainability standard. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc*., 821 F.3d 992, 995–996 (8th Cir. 2016). In the Eighth Circuit, "[a] class may be ascertainable when its members may be ***identified by reference to objective criteria***." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017) (citing *Sandusky*, 821 F.3d at 997) (emphasis added).

In this respect, "[t]he standard for ascertainability is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (internal citations omitted). "[A] plaintiff need only show that class members *can* be identified." *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (emphasis in original). To do so, a class definition must allow members to be identified "without resort to intensive, individualized factual inquiries." *Dumas v. Albers Medical, Inc.*, No. 03-640, 2005 WL 2172030, at *5 (W.D. Mo. Sept. 7, 2005).[13]

Here, whether someone owns or leases a Class Vehicle is a verifiable fact, just as whether someone previously paid for repairs to a Class Vehicle is a verifiable fact. This determination does not necessitate a merits inquiry or consideration of an individual Class member's state of mind. To the contrary, the definition contemplates plainly objective criteria that can be verified for each

---

[13]     Ascertainability does not demand that every class member be identified. *In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 280 (D. Kan. 2010); *accord Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 687 (S.D. Fla. 2014) (identification of class members need not be "next to flawless").

Class member who comes forward to make a claim. Thus, the proposed Class is sufficiently ascertainable.

## IV.     In Addition, Or Alternatively, Rule 23(c)(4) Issue Certification Is Warranted

Should the Court determine that Plaintiff's class cannot be certified under Rule 23(b)(3) or prefers to determine liability in the first instance and damages at a later phase, it should certify each of the common issues enumerated above in Section I(B) under Rule 23(c)(4).[14]

"When appropriate an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The relevant inquiry under Rule 23(c)(4)(A) is whether resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *Nelson v. Wal-Mart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark. 2007) (quotations omitted).[15] There is ample support for the use of class actions to determine liability: "the class action device save[s] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979). Class actions – including issue classes – are appropriate when it is possible to resolve efficiently and effectively whether a defendant is liable on the basis of "if as to one, then as to all."[16] Few cases are better suited to such resolution than this one.

---

[14]     Because individualized damages proceedings would only take place following a finding of liability in the Plaintiff's favor, it would be unnecessary to consider a class-wide damages theory under *Comcast*. *See Butler v. Sear, Roebuck & Co.*, 727 F.3d 796, 799-802 (7th Cir. 2013).

[15]     Although the Eighth Circuit has not squarely addressed the issue, *see In re St. Jude Medical, Inc.*, 522 F.3d 836, 841 (8th Cir. 2008) the majority of courts that have considered it have held that Rule 23(c)(4) can be used to certify specific questions, even where the case as a whole does not otherwise satisfy the Rule 23(b)(3) predominance. *See Butler*, 727 F.3d at 800; *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 109 (2d Cir. 2007); *Gunnels v. Healthplan Servs., Inc.*, 348 F.3d 417, 438-46 (4th Cir. 2003).

[16]     *See* Richard A. Nagareda, 1938 All Over Again? Pretrial as Trial in Complex Litigation, 60 DEPAUL L. REV. 647, 671 (2011).

This case is unremarkable from other consumer product cases that have been certified recently under Rule 23(c)(4). Here, the use of issue certification under Rule 23(c)(4) would benefit each class member by resolving central issues on a common basis—an approach that would greatly streamline and facilitate the litigation moving forward. *E.g., Butler*, 727 F.3d at 800 ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification"); *In re Whirlpool*, 722 F.3d 838 (6th Cir. 2013), cert. denied; *In re Motor Fuel Temp. Sales Practices Litig.*, 292 F.R.D. at 665 (citing cases). For all the foregoing reasons, certification under Rule 23(c)(4) in this case is particularly appropriate. *See Nelson*, 245 F.R.D. at 380.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court (1) grant her Motion for Class Certification; (2) appoint Laura Frances Hays as the Class Representative; and (3) and appoint as Class Counsel pursuant to Fed. R. Civ. P. 23(g) the attorneys of Stueve Siegel Hanson LLP, Williams Dirks Dameron LLC, and Dollar, Burns & Becker, LC. Finally, Plaintiff requests that the Court order the parties to submit an agreed-upon class notice or submit any disputes they may have over class notice within 21 days of a class certification order so that notice may be issued promptly.

**WHEREFORE,** for the reasons set forth herein, the Court should grant Plaintiff's Motion for Class Certification.

DATED:     October 12, 2018     Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

*/s/ Matthew L. Dameron*

Matthew L. Dameron  MO Bar No. 52093
Amy R. Jackson     MO Bar No. 70144
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:     (816) 945-7110
Email:     matt@williamsdirks.com
     amy@williamsdirks.com

Norman E. Siegel     MO Bar No. 44378
Toji Calabro     MO Bar No. 66574
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:     (816) 714-7100
Email:     siegel@stuevesiegel.com
     calabro@stuevesiegel.com

Tim E. Dollar     MO Bar No. 33123
JJ Burns     MO Bar No. 64758
**DOLLAR, BURNS & BECKER, LC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:     (816) 876-2600
Email:     timd@dollar-law.com
     jjb@dollar-law.com

*Counsel for Plaintiff and the*
*Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 12, 2018 the foregoing was (1) filed under seal via the Court's ECF system which provided service to counsel for Defendant, and (2) served via electronic mail on counsel for Defendant.

*/s/ Matthew L. Dameron*
Counsel for Plaintiff and the Proposed Class