# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIE DEMARIA, | ) | |
| SHERI GRIMM, | ) | |
| JUANITA WALKER, | ) | |
| DOUG BURKHOLDER, | ) | |
| KEITH SIEFKEN, | ) | |
| HERB BROWN, | ) | |
| CANDACE KIXMILLER, | ) | |
| ROSLYN CORBIN | ) | |
| DENNIS BIRD, | ) | |
| NITZALI BELTRAN-ASHLINE | ) | |
| DONALD YOUNG, | ) | |
| TWILA ASHWORTH | ) | |
| THOMAS WILBUR, | ) | |
| PETER PETERSEN | ) | |
| JOSEPH MILLER, | ) | |
| TAMMY PETTY, | ) | |
| LAURIE SAUDER, and | ) | |
| GARY OLDS, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-CV-03321 |
| | ) | |
| NISSAN NORTH AMERICA, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| NISSAN MOTOR COMPANY, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs bring this proposed class action on behalf of themselves and other similarly situated owners and lessees of Nissan Altima automobiles for model years 2002-2006, and Nissan Maxima automobiles for model years 2004-2008 ("Class Vehicles"), and allege as follows:

1

## INTRODUCTION

1.      This proposed class action lawsuit arises from a safety defect plaguing a seven-model-year span of the popular Nissan Altima and Maxima vehicles. The defect affects the vehicles' floorboards—a metal panel that is the only real barrier between the road and drivers and their passengers.

2.      The defect makes the Altima and Maxima floorboards prone to severe rust and corrosion—a problem that should not exist in any modern automobiles. Making matters worse, even though the rust and corrosion begins inside the cabin, it is not visible to vehicle occupants because the floorboards are covered by carpeting. It is also not visible to mechanics and technicians until the corrosion has progressed from the inside to the exterior underside of the vehicle.  As a result, many Altimas and Maximas have had gaping holes develop—so large in fact that a passenger's foot or a large rock could fit through the gap before he or she realizes that the floorboard has been compromised.

3.      Although the safety hazards posed by these corroded floorboards are undeniable, and Nissan has known of the defect for many years, Nissan concealed the defect in order to sell more vehicles and to avoid bearing the resulting repair costs (which can be hundreds or thousands of dollars). Plaintiffs thus bring this suit on their own behalf, and on behalf of other affected drivers, to enjoin Nissan's unlawful conduct and to obtain all remuneration available under the law.

## PARTIES

4.      Plaintiff Marie Demaria is a citizen and resident of Kane County, Illinois.

5.      Plaintiff Sheri Grimm is a citizen and resident of St. Louis County, Missouri.

6.      Plaintiff Juanita Walker is a citizen and resident of Jefferson County, Alabama.

2

7.      Plaintiff Doug Burkholder is a citizen and resident of Elkhart County, Indiana.

8.      Plaintiff Keith Siefken is a citizen and resident of Linn County, Iowa.

9.      Plaintiff Herb Brown is a citizen and resident of Johnson County, Kansas.

10.     Plaintiff Candace Kixmiller is a citizen and resident of Boyle County, Kentucky.

11.     Plaintiff Rosyln Corbin is a citizen and resident of Baltimore County, Maryland.

12.     Plaintiff Dennis Bird is a citizen and resident of Middlesex County, Massachusetts.

13.     Plaintiff Nitzali Beltran-Ashline is a citizen and resident of Hampden County, Massachusetts.

14.     Plaintiff Donald Young is a citizen and resident of Livingston County, Michigan.

15.     Plaintiff Twila Ashworth is a citizen and resident of St. Louis County, Missouri.

16.     Plaintiff Thomas Wilbur is a citizen and resident of Rockingham County, New Hampshire.

17.     Plaintiff Peter Petersen is a citizen and resident of Essex County, New Jersey.

18.     Plaintiff Joseph Miller is a citizen and resident of Nassau County, New York.

19.     Plaintiff Tammy Petty is a citizen and resident of Vinton County, Ohio.

20.     Plaintiff Laurie Sauder is a citizen and resident of Lancaster County, Pennsylvania.

21.     Plaintiff Gary Olds is a citizen and resident of Prince William County, Virginia.

22.     Nissan North America, Inc. is a California corporation that has its headquarters and principal place of business in Franklin, Tennessee. It may be served via its registered agent at: Corporation Service Company; 2710 Gateway Oaks Drive, Suite 150N; Sacramento,

3

California 95833. Nissan North America, Inc. is the United States subsidiary of Nissan Motor Company, Ltd., which is a company that has its headquarters in Japan.

23.     Plaintiffs shall refer collectively to Nissan North America, Inc. and Nissan Motor Company, Ltd. as "Nissan."

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act because the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs, and at least one member of the Plaintiff class is a citizen of a State different from Nissan. 28 U.S.C. § 1332(d)(2)(A).

25.     The Court may exercise jurisdiction over Nissan because Nissan is registered to conduct business in Illinois; has sufficient minimum contacts in Illinois; and intentionally avails itself of the markets within Illinois through the promotion, sale, marketing and distribution of its vehicles.

26.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred or a substantial part of property that is subject of the action is located in this District.

## FACTUAL ALLEGATIONS

27.     Nissan manufactures, markets, distributes and warrants automobiles in the United States, including Nissan Altima and Maxima automobiles. This case concerns the 2002-2006 model year Nissan Altima, and the 2004-2008 model year Nissan Maxima.

28.     In 2002, Nissan introduced its new FF-L vehicle platform when it debuted the third-generation of the Altima in the United States. Subsequently in 2004, Nissan launched a new

4

generation of the Nissan Maxima on the same platform. Like other vehicles that share the same platform, these generations of the Altima and Maxima share a common underbody structure.

29.     The Nissan Maxima is a full-sized vehicle which is advertised as a luxury sedan. The Nissan Altima is a mid-size vehicle and is Nissan's bestselling vehicle, accounting for approximately 25% of Nissan's total annual sales.

30.     Like most modern vehicles, the Nissan Altima and Maxima utilize a unibody construction where the vehicle's frame and body are a combination of structural and semi-structural panels that are welded together, forming a single unit. Each panel is dependent upon the adjacent panels to give the vehicle strength and rigidity. This results in a single fully integrated body structure where the entire car is a load-carrying unit that handles all the loads experienced by the vehicle, including forces from driving as well as cargo loads. As can be seen below, the unibody underbody includes the front, center, and rear sections of the floor pan (or floorboard),[1] trunk pan, rocker panels, front, side and rear cross members, and related parts. The unibody underbody adds strength to the unibody structure, prevents the elements and road debris from entering the car, and must resist rusting and corrosion. These parts are depicted here:

---

[1] Plaintiffs use the words 'floorboard' and 'floor pan' interchangeably.

5



31.     The front floor pan is a single piece of metal that spans the front driver and passenger compartments forming the floor of the vehicle for the front passenger and driver. Normally the floor pan is covered in carpet. Floor pans are intended to last the life of the vehicle and are not a "wear component" that owners or service technicians expect to repair or replace during the vehicle's anticipated useful life. A floor pan schematic appears below:



6

32.     Nissan and the automotive industry have known for decades that rust and corrosion may cause floorboards to degrade. Any floorboard degradation in unibody vehicles poses a serious potential safety hazard. The corrosion can allow exhaust and other harmful fumes to enter the cabin. In the event of a collision a degraded floorboard can increase the chance of injury or death to the vehicle's occupants by reducing the vehicle's structural integrity as well as the integrity of the component parts that attach to the floorboard, such as passenger seating. And in locations that require vehicle inspections, automobiles with degraded floorboards will not pass inspection, leaving owners unable to use their vehicles.

33.     All modern vehicle designs assume moisture will be routinely introduced to the vehicle's interior and will come in contact with the floorboard (for example, ingress during rain or snow, car washing, or when passengers eat or drink in the passenger cabin). When proper care and expense is devoted upfront, manufacturers can largely eliminate the risk of floorboard rust and corrosion. In fact, due to vast improvements in manufacturing and design technologies, motor vehicles manufactured in recent decades experience significantly reduced levels of corrosion.

34.     Unfortunately, Nissan elected to produce and sell Class Vehicles with inadequate floorboard corrosion protection—despite advancements in technologies for corrosion prevention, and despite the safety risks corroding floorboards present. Standard corrosion prevention techniques include the use of corrosion-resistant materials, coated steels, sealers, and polymers. In Class Vehicles, however, Nissan opted to deviate from optimal corrosion prevention, manufactured Class Vehicles in which moisture does not dissipate efficiently when in contact with the metal floorboard, and produced floorboards that corrode at an accelerated rate, rust, and

7

become structurally unsound.  This deviation occurred in or around 2001, when Nissan made a switch in the steel sheet used in the body of Class Vehicles.

35.     The defect was known to Nissan immediately.  It has long been industry standard, including at Nissan, to perform a number of presale tests to assess components such as the floorboard for any tendency to corrode.  Among other things, this testing is to assure that moisture dissipates and does not cause alloy changes in the floorboard.  The tests evaluate both the selected mechanism of corrosion protection and the completed assembly.  It is not plausible that Nissan could have performed comprehensive testing of this nature without detecting the defect.

36.     Nissan thus knew of the defect, both from its production experience and its extensive pre-release testing, since 2001, when it first sold and leased Class Vehicles. Yet Nissan continued to sell and lease new Class Vehicles with this defect for about seven more years. All the while, Nissan received data confirming the problem, ranging from customer complaints to warranty claims.

37.     Although Nissan's aggregated data, including warranty claims and customer complaints, are known only to Nissan, it is not difficult to surmise what Nissan was learning in the early to mid-2000s. With respect to warranty data, the Class Vehicles came with a stand-alone, five-year warranty for corrosion, so Nissan needed to do nothing in the way of analytics to know that a worrisome percentage of its customers were submitting corrosion related warranty claims.  And complaining drivers have been very vocal about the defect given the danger it poses.  Although only a small percentage of those complaints are public, many more were made to Nissan directly, and they tend to report serious concern about the corrosion and rust, which can be seen in part in the photographs below.

8





9



38.     The photographs illustrate that the Class Vehicle floorboards may rust completely through, which is particularly dangerous because the interior carpet hides the problem, allowing large holes to develop before the problem is detected. Although the underside of the floor and wheelhouse are undercoated to prevent rust, the corrosion in Class Vehicles begins on the inside and is only visible outside the vehicle once the floorboard has rusted all the way through.  Left unchecked, the corrosion may continue to spread, further compromising the vehicle structure.

39.     Nissan has acknowledged internally and through non-public communications with its dealerships that Class Vehicles are defective, leading to floorboard rusting and corrosion. For example, Nissan issued a technical service bulletin that applies to all 2002-2006 model year Altima and 2004-2008 model year Maxima vehicles. The bulletin calls for a "floor pan" repair because of the common development of floorboard rust and corrosion. The bulletin includes an example photograph, which depicts a floorboard with massive amounts of rust and a hole. Along with the service bulletin, Nissan sent a floor pan repair kit bulletin to its dealerships' service and

10

parts managers, which discusses the "new, low-cost repair for floor pan corrosion." As with the technical service bulletin, this bulletin applies to all Class Vehicles. Neither bulletin instructs dealerships to be on the lookout for Class Vehicle floorboard rust generally, however, nor do they instruct dealerships to warn drivers about the defect or its risks.

40.     Nissan's service bulletin, instructs dealers to (1) clean the rusted area of the floorboard, and (2) using adhesive, install a "repair plate" that covers the rusted area of the floorboard. The bulletin does not instruct dealers to remove or excise the rusted area of the floorboard. In effect, the bulletin instructs dealers to apply a patch over the rusted area of the floorboard. If a consumer has the repair plate installed, the consumer will need to pay approximately five hundred dollars toward the repair offered by the bulletin, even though—according to the TSB—the materials for the repair cost only $111.57.

41.     The defect has now led more than 400 drivers to complain to the National Highway Traffic Safety Administration (NHTSA) about the problem—a large number given that many drivers are not familiar with the NHTSA and instead complain, if at all, directly to Nissan or one of its dealerships.[2] A sampling of complaints from the NHTSA website include:

NHTSA ID Number: 10269941

> Floor rusted through on a 2003 Nissan Altima 3.5 SE with only 5500 miles on it. In service date of the vehicle was April 30, 2003. The hole in the floor vehicle was noticed in May of 2009. Rust perforation warranty from Nissan is for 5 years only. Nissan unwilling to help. Exhaust and other fumes can enter the car. This is unacceptable for a car with this low mileage.

NHTSA ID Number: 10281316

---

[2] Ryan Kath, *Nissan owners feel road rage, express safety concerns over rust problem hiding beneath their feet*, KSHB.com (Feb. 9, 2015; updated Feb. 11, 2015) available at: http://www.kshb.com/news/local-news/investigations/nissan-owners-feel-road-rage-express-safety-concerns-over-rust-problem-hiding-beneath-their-feet (last accessed Feb. 18, 2015).

I own a 2003 Nissan Altima that was purchased brand new. The car has never been in an accident and has always been well maintained . . . washed and waxed regularly. I was changing the oil on 7/28/09 and noticed something hanging from the passenger side floor which turned out to be the remains of said floor. There is a rust hole approximately 2 foot long and 6 inches wide in the passenger side of this 6 year old car. After doing some research online I see this is a fairly common failure for this generation Altima and Nissan will do absolutely nothing to help with the repair since the perforation warranty is over as of 10/08. I have had the car into the dealership for recall work and nobody from the dealership ever mentioned the hole in this vehicle which at that time would have been covered by warranty. Nissan flat out denies to do anything to help with the repair regardless of the fact that this shouldn't be happening to a 6 year old car in the first place. It's an obvious safety issue with a giant hole in the floor that exhaust fumes can enter but Nissan refuses to acknowledge the design flaw in the vehicle. Please help me to force Nissan to admit the problem exists and get it fixed at their cost.

NHTSA ID Number: 10281326

Defective sheet metal design in floor pan of Nissan Altimas, body style beginning with model year 2002. Design flaw caused large rust holes in front of driver and passenger seat, seemingly by trapping moisture. My holes approx. 12" each. I am hearing similar complaints from other Altima owners. Perforation warranty was 5 years, and due to my dealership not noticing the problem within that period, Nissan claims no responsibility. These holes may alter the structural integrity of the body frame in case of side impact. Additionally, water enters the cabin and remains in the carpet and pad. My floor pan will need to be replaced, and am preparing to schedule the work. Nissans recommended local body shop has estimated repairs approx. $2300 US.

NHTSA ID Number: 10732710

Passenger floorboard rusted out and was repaired at a collision repair shop in Dec. 2013. I felt branches and sticks through the floorboard. it was approximately 8" in diameter. In June 2015 I found where the drivers side is now rusted out. The car has been garaged the car has had deep rubber floor mats in the winter passenger side repair done at 122,000 miles driver's side repair done at 139,000 miles

NHTSA ID Number: 10731572

I brought my car to firestone to have numerous repairs done on my car 6/27/15-6/30/15. While they had the car up on the lift, the tech noticed and told me that my floor boards are rusting out and he could see clear through to my carpeting. My windows have been repeatedly getting dirty from the inside and I could never figure out why. I have asthma and I am very concerned about the fumes that are entering my vehicle. This now explains why I feel the need to use my inhaler more frequently when I'm in my car or getting out of my car on shorter trips. For instance, I have a 1.5 mile ride to the train for my commute to work. By the time I get to the train, I'll need to use my inhaler again already. My car is paid off. i had planned to keep this car as long as I possibly could so I can pay down debt. Also, I had just this past weekend spent around $700 in repairs on my car. I've taken very good care of my car (i.e., regular oil changes, tire rotation, etc.). I just want Nissan to fix the problem so I can keep my car. Other than this issue, I love my car. I've had very few minor problems with it over the years and I'm overall very happy with it, except for this issue. I hope you can get them to help everyone similarly situated.

NHTSA ID Number: 10668860

Floor boards rusted totally thru on drivers [sic] side and passengers [sic] side. Only thing stopping feet from going thru the floor is carpet. Seems to be a ongoing problem with the floors on Nissan. I believe this is a very dangerous problem that should be corrected by Nissan as a recall safety issue.

NHTSA ID: 10464308

I have a 2004 00 SL with 90,000(mi) as I was driving on a rainy day I noticed the passenger front mat was getting wet when I got home I removed the mat and carpet and to my surprised I found a sizable rust hole in the floor passenger side . I took the car to the dealer and informed the manager of my discovery she told me that she was going to contact Nissan and find out what to do. In the mean time I stopped by a few autobody shops to get quotes on fixing it I tried 5 shops and most of them refuse to touch it because is a structural part of the vehicle, they also told me they thought I should go see the dealer as the car shouldn't rust like that being so new. A few days later I went back to the dealer and asked the manager if she ha heard from Nissan she said no, she mentioned that she has seen couple more cars come in for inspections and they noticed that the bottoms on the passenger sides were rusted

13

consequently failing inspection. Nissan should make a recall or force to make a recall on this issue my car is worthless because of the structural damage it has. Nissan should be responsible for these repairs for using weak or cheaper materials.

NHTSA ID: 10535619

I have extensive rust through on both driver side and passenger front floor pans. It appears there was originally a double layer of metal and both layers are rusted with large holes in them. The car is beyond the five year rust through warranty but this really is severe and difficult to notice since it is under the car. The rust does not appear to be from the outside but appears to be from the inside out. I do not know what would cause the rust to begin from the inside but seems to be a design defect to me. I will take this up with Nissan as I bought the car new, but I doubt they will offer to stand behind this, since this is extremely dangerous as it is possible for fumes or road debris to come through the carpet and into the passenger compartment. I am not certain what the mileage was when this began but this amount of rust did not begin recently. I suspect may Nissan Maxima's are affected by this problem and there should be some sort of safety notice to current owners to make them aware of this problem.

NHTSA ID: 10731852

I noticed a smell when I was driving a couple weeks ago, so I took my 2004 Nissan Maxima into a local mechanic that i trust on 6/26/15. After putting the car in the air, it took him two seconds to note the problem: the floor panels on the front passenger and driver side are completely rotting/rusting through from the inside out. You can see my carpet through the bottom of my car on the driver's side. Mind you, there is no history of flood damage to this car (i paid the $40 for a Carfax to find out), and I live in Tennessee, where we do not get enough snow for salt to cause any damage. I've done an amazing job taking care of my car and am highly disappointed with this situation. I've also done my research and have noticed multiple complaints on this issue on the NHTSA website, so I know I'm just one of many 2004 maxima owners with this problem. This problem is an immense safety hazard. I was told i might be able to drive my car safely for another month or two before I risk my seat falling forward with me if I brake too suddenly. With as many customers who have had this problem and the fact that the damage begins localized on both the driver and passenger sides, respectively, this appears to be a structural defect

14

in the 2004 Maxima that needs to be corrected to ensure the
continued safety of these cars' drivers.[3]

42.     Consumers have taken to other websites to complain. For example, on the

consumer affairs website, a consumer posted:

> I have a 2005 Nissan Altima with 121,000 miles. I am the original
> owner and this car has been garaged for most of its life. I was
> shocked last week, when an independent dealer was changing the
> oil, to find that the floor pans are completely rusted out. After
> researching this, I find that it is a very common problem among
> this car. I am extremely angry that Nissan is not acknowledging
> and fixing this manufacturing defect. Our Nissan dealership has
> done the majority of this service, and never once have they brought
> it to my attention. This is a safety hazard and should be addressed
> immediately by Nissan.[4]

43.     On another car complaints website, another consumer posted:

> Owner of 2005 Nissan Altima (purchased new), garage kept,
> regularly maintained (oil changes, brakes, etc.) at dealership. On
> October 15 while I at [sic] the dealership for oil change I
> mentioned rattle from underneath the car and would they check for
> me. Their findings was [sic] a new muffler system for $623 (which
> I did not have done).
>
> On way home stopped at private muffler dealer for their opinion
> and that's when I found out about the rusted out floorboards. There
> is not one bit of rust on the rest of the car. Never in the 9 1/2 years
> did the dealership ever mention this occurring. Contacted Nissan
> Consumer Affairs, was assigned a Regional Rep who instructed me
> to take photos and get an estimate. Their decision was they were
> not about to take responsibility. I'm told a TSB (Technical Service
> Bulletin) was issued by the consumer was never made aware. This
> is definitely a defect and someone at Nissan should own up to it![5]

---

[3] Available at: http://www-odi.nhtsa.dot.gov/owners/SearchSafetyIssues (last accessed July 21
2015).

[4] Available at: http://www.consumeraffairs.com/automotive/nissan_altima.html?page=2 (last accessed
Feb. 19, 2015).

[5] Available at:
www.carcomplaints.com/Nissan/Altima/2005/body_paint/floor_pan_rusted_through.shtml (last
accessed Feb. 19, 2015).

15

44.     According to a recent report that analyzed the NHTSA complaints, "[m]any of the vehicle owners said they could not get help from Nissan to fix the problem."[6] Nissan never extended its warranty to owners of Class Vehicles with rusted floorboards, and in many cases denied warranty liability or blamed the owners themselves for causing the corrosion. Instead, Nissan recently stated that, "Nissan said it has no plans to order a recall and notes that corrosion in older cars is not unusual."[7] Likewise, from 2001-2008, when it was selling and leasing new Class Vehicles, continuing through the present, Nissan has never told consumers that the floorboards corrode and rust completely through during normal operation.

45.     Nissan had exclusive and superior knowledge of the floorboard defect and actively concealed the defect and corresponding danger from consumers who had no way to reasonably discover the problem before buying and driving their Class Vehicles. Had consumers been aware of the defect, they would not have purchased their Class Vehicles or would have paid less money for them. A reasonable person would consider the defect important information and would either (1) pay substantially less for a Class Vehicle with a dangerously defective floorboard, or (2) not purchase or lease one at all.

---

[6] Ryan Kath, *Nissan owners feel road rage, express safety concerns over rust problem hiding beneath their feet*, KSHB.com (Feb. 9, 2015; updated Feb. 11, 2015) available at: http://www.kshb.com/news/local-news/investigations/nissan-owners-feel-road-rage-express-safety-concerns-over-rust-problem-hiding-beneath-their-feet (last accessed Feb. 18, 2015).

[7] Tom Costello and Talesha Reynolds, *Nissan drivers gripe about rusty floor holes in older Altimas*, nbcnews.com (April 6, 2015) available at http://www.nbcnews.com/news/us-news/rust-n333291.

16

**Plaintiffs' Experiences**

*Marie Demaria – Illinois*

46.     Plaintiff Marie Demaria purchased her 2005 Nissan Altima in 2010 in Illinois.

47.     Demaria purchased her Altima for personal use.

48.     In the Summer of 2014, Demaria found that the underside of the floorboard was completely rusted out, such that she was able to see the roadway through the floor when she lifted the vehicle's carpet.

49.     A Nissan dealership told Demaria that it would cost approximately $3,000 to repair the damage. The Nissan dealership refused to cover the costs of the repair.

*Sheri Grimm – Missouri*

50.     Plaintiff Sheri Grimm purchased her 2002 Nissan Altima used in 2006.

51.     Grimm purchased her Altima at Moore Nissan in Ellisville, Missouri.

52.     Grimm purchased her Altima for personal use.

53.     In 2015, Grimm discovered significant rust on the underside of her floorboard.

*Juanita Walker – Alabama*

54.     Plaintiff Juanita Walker purchased her 2003 Nissan Altima in 2005.

55.     Walker purchased her Altima from Crown Nissan in Hoover, Alabama.

56.     Walker discovered the rust in her floorboards when she removed the floor mats for cleaning.

*Doug Burkholder – Indiana*

57.     Plaintiff Doug Burkholder purchased his 2005 Altima in 2014.

58.     Burkholder purchased his Altima in a private sale in Wakarusa, Indiana.

59.     In April 2015, Burkholder discovered rust under his floorboards when he took his vehicle for an oil change.

60.     Burkholder received an estimate of approximately $600 to patch the rusted spots in his floorboards.

61.     In April 2015, Burkholder's Altima failed to pass a state inspection because there is a hole in the vehicle's passenger side floorboard due to rust.

***Keith Siefken – Iowa***

62.     Plaintiff Keith Siefken purchased his 2005 Altima in 2006.

63.     Siefken purchased his Altima from Cassill Motors Incorporated in Cedar Rapids, Iowa.

64.     In April 2015, Siefken discovered the rust in his driver's side floorboard during routine maintenance of the vehicle.

65.     Siefken received an estimate of approximately $3,000.00 to repair the rusted floorboards in his vehicle.

***Herb Brown – Kansas***

66.     Plaintiff Herb Brown purchased his 2006 Altima in 2010.

67.     Brown purchased his Altima from Performance Toyota in Kansas City, Kansas.

68.     In the fall of 2014, Brown discovered rust under his Altima's floorboards during routine maintenance.

69.     Brown complained to Nissan about the rust; Nissan refused to assist him or pay for any repairs because it said the vehicle was out of warranty.

70.     Brown received two estimates to repair the rust on his vehicle: one for approximately $2,800, and another for approximately $3,800.

18

### Candace Kixmiller – Kentucky

71.  Plaintiff Candace Kixmiller purchased her 2002 Altima in 2004.

72.  Kixmiller purchased her Altima from Bob Allen Motor Mall in Danville, Kentucky.

73.  In March 2015, Kixmiller discovered significant rust under the floorboards of her vehicle during routine maintenance.

74.  Kixmiller complained about the rust on her vehicle to Nissan.

75.  Kixmiller received an estimate of approximately $5,200 to repair the rust on her vehicle.

### Roslyn Corbin - Maryland

76.  Plaintiff Roslyn Corbin purchased her 2005 Altima new in 2004.

77.  Corbin purchased her Altima from Nationwide Nissan in Woodlawn, Maryland.

78.  In October 2014, Corbin discovered the rust in her front floorboard when her mechanic was changing her brake pads.

79.  Corbin received two estimates to patch the rust in her vehicle: one for approximately $700, and another for approximately $500.

### Dennis Bird – Massachusetts

80.  Plaintiff Dennis Bird purchased his 2006 Altima in 2006.

81.  Bird purchased his Altima at Framingham Nissan in Framingham, Massachusetts.

82.  In November 2014, Bird discovered the rust in his floorboards during a routine oil change.

83.  Bird received an estimate of approximately $800.00 to patch the rust.

84.  Bird complained to Nissan about the rust.

19

*Nitzali Beltran-Ashline – Massachusetts*

85.     Plaintiff Nitzali Beltran-Ashline purchased a 2005 Altima new in or around 2004.

86.     She purchased her Altima at a Nissan dealer in Massachusetts.

87.     She purchased her Altima for personal use.

88.     In late 2014 or early 2015, Beltran-Ashline and her husband discovered significant corrosion and a hole in the floorboards of their Altima.

89.     Ms. Beltran-Ashline's husband repaired the hole himself.

*Donald Young – Michigan*

90.     Plaintiff Donald Young purchased his 2006 Nissan Altima in 2007.

91.     Young purchased his Altima at Suburban Imports in Farmington Hills, Michigan.

92.     In April 2015, Young discovered rust under his driver and passenger floorboards during a routine oil change.

93.     Young received an estimate of approximately $800 to patch the rust in the floorboards of his vehicle.

*Twila Ashworth – Missouri*

94.     Plaintiff Twila Ashworth purchased her 2004 Altima in 2007.

95.     Ashworth purchased her Altima at Bommarito Automotive Group in Ellisville, Missouri.

96.     She purchased her Altima for personal use.

97.     In late 2014, Ashworth took her vehicle for an oil change and was told by a technician that there was a hole in the floorboard of her passenger seat.

98.     Ashworth had the hole repaired at a cost of about $350.

*Thomas Wilbur – New Hampshire*

99.     Plaintiff Thomas Wilbur purchased his 2006 Altima in 2009.

100.    Wilbur purchased his Altima from Port City Nissan in Portsmouth, New Hampshire.

101.    In March 2015, Wilbur discovered rust under his front passenger floorboard during maintenance for another issue.

102.    Wilbur's repair shop told him that the Altima likely would not pass state safety inspections unless he repairs the rust.

*Peter Petersen – New Jersey*

103.    Plaintiff Peter Petersen purchased his 2005 Altima new in about 2005.

104.    Petersen purchased his Altima at a Nissan dealer located in Hillside, New Jersey.

105.    He purchased his Altima for personal use.

106.    In late 2014 or early 2015, Petersen was having his tires changed when a technician informed him that there was significant corrosion underneath his car. Petersen pulled up the carpet and discovered a hole in the passenger floorboard of his vehicle.

107.    Petersen repaired the hole himself at a cost of about $100 in parts.

*Joseph Miller – New York*

108.    Plaintiff Joseph Miller purchased his 2005 Altima new in the Summer of 2004.

109.    Miller purchased his Altima at Biener Nissan / Audi in Great Neck, New York.

110.    In May 2015, Miller discovered rust under his passenger side floorboards.

111.    Miller received an estimate of approximately $450.00 to patch the rust on his vehicle.

112.    Miller complained to NHTSA and his local Nissan dealership concerning the rust.

*Tammy Petty - Ohio*

113.    Plaintiff Tammy Petty purchased her 2004 Maxima in August 2014 in a private transaction in Ohio.

114.    In early 2015, Petty discovered rust in both of her front floorboards when her mechanic was replacing the brakes.

115.    Petty complained to Nissan after she discovered the rust; she has not received a response.

*Laurie Sauder – Pennsylvania*

116.    Plaintiff Laurie Sauder purchased her 2004 Altima in 2011.

117.    Sauder purchased her Altima in a private sale in Pennsylvania.

118.    Sauder discovered the rust on her Altima during a multipoint inspection at a Nissan dealership.

119.    Sauder paid approximately $300.00 to have the rust patched.

*Gary Olds - Virginia*

120.    Plaintiff Gary Olds purchased his 2005 Altima new in 2005.

121.    Olds purchased his Altima from Sheehy Nissan in Manassas, Virginia.

122.    Olds discovered the rust in his passenger side floorboard in May 2015 during a state safety inspection.

123.    Olds's vehicle failed the state inspection because of the rust.

124.    Olds spent approximately $150 to patch the rust so his vehicle could pass the state inspection until it must undergo another inspection in 2016. Even with the repair, it is unclear whether the vehicle will pass inspection in 2016.

## CLASS ACTION ALLEGATIONS

125.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action

on behalf of themselves and the following proposed Nationwide Class:

> ***All persons who purchased or leased a Nissan Altima model years 2002-2006 or Nissan Maxima model years 2004-2008 in the United States ("Nationwide Class").***

126.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs allege, in the

alternative, statewide class action claims on behalf of classes in the following states: Alabama,

Illinois, Indiana, Iowa, Kansas, Kentucky, Massachusetts, Michigan, Missouri, New Hampshire,

New York, and Pennsylvania. Each of these State Subclasses is initially defined as follows:

> ***All persons who purchased or leased a Nissan Altima model years 2002-2006 or Nissan Maxima model years 2004-2008 in the state of _____ (e.g., Illinois).***

127.     Excluded from the Classes are Defendant, any affiliate, parent, employee or

subsidiary of Defendant; any officer, director, or employee of Defendant; anyone employed by

counsel for Plaintiffs in this action; and any Judge to whom this case is assigned as well as his or

her immediate family.

128.     This action has been brought and may be properly maintained as a class action

under Federal Rule of Civil Procedure 23.

129.     <u>Numerosity of the Class – Rule 23(a)(1)</u>. Class members are so numerous that

their individual joinder is impracticable. The precise number of Class members and their

addresses can be obtained from information and records in Nissan's possession and control.

Class members may be notified of the pendency of this action by mail, or by published notice or

other appropriate methods.

130. <u>Existence and Predominance of Common Questions of Law and Fact – Rule 23(a)(2), 23(b)(3)</u>. Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

      a.      Whether the Class Vehicles' floorboards are defective;

      b.      When Nissan became aware of the defect;

      c.      Whether the defect is material;

      d.      Whether Nissan concealed the defect;

      e.      Whether Nissan profited from its concealment of the defect;

      f.      Whether Nissan's conduct harmed Plaintiffs and the Class;

      g.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including declaratory relief, restitution, rescission, a preliminary and/or a permanent injunction; and

      h.      Whether Plaintiffs and the other Class members are entitled to damages and/or other monetary relief.

131. <u>Typicality – Rule 23(a)(3)</u>. Plaintiffs' claims are typical of the claims of the Classes because each Plaintiff purchased a 2002-2006 model year Nissan Altima or a 2004-2008 model year Nissan Maxima.

132. <u>Adequacy of Representation – Rule 23(a)(4)</u>. Plaintiffs will fairly and adequately protect the interests of Class members because their interests do not conflict with the interests of the members of the Classes they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously.

133.  <u>Superiority - Rule 23(b)(3)</u>. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the harm done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

134.  In the alternative, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

    b.  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not

parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.   Nissan has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## TOLLING

135.   Any applicable statute of limitations that might otherwise bar any Class member's claim has been tolled by Nissan's knowing and active concealment of the facts alleged above. Plaintiffs and Class members were ignorant of vital information essential to the pursuit of their claims. Plaintiffs and Class members could not reasonably have discovered that their Nissan Altima and Maxima vehicles were defective because Nissan did not provide relevant information about the defect to the NHTSA or to vehicle owners/lessors, and continues to refuse to provide such notice to consumers.

## COUNT ONE
### Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*
### (Brought on behalf of the Nationwide Class)

136.   Plaintiffs, on behalf of themselves and the proposed Nationwide Class, hereby re-allege the paragraphs above as if fully set forth herein.

137.   Under 28 U.S.C. § 2201, where there is an "actual controversy" within its jurisdiction, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

138.   There is an actual controversy between Nissan and Plaintiffs concerning:

a.   Whether the Class Vehicles are defective;

b.   Whether Nissan knew or should have known of the defect;

26

c.  Whether Nissan failed to warn against the potential unsuitability of its defective Class Vehicles;

d.  Whether Nissan knowingly denies the existence of the defect in Class Vehicles; and

e.  Whether Nissan bears responsibility for providing cost-free repairs and other remuneration to purchasers and lessees of Class Vehicles.

139.    Despite the repeated, documented failures of the Class Vehicles, Nissan refuses to acknowledge that they are defective, frequently blaming its customers for causing the damage.

140.    Accordingly, based on Nissan's failure to act, Plaintiffs seek a declaration that the Class Vehicles are defective, as alleged herein. The defective nature of the Class Vehicles is material and requires disclosure to all members of the Class.

141.    The declaratory relief requested herein will generate common answers that will settle the controversy related to the alleged defect. There is an economy to resolving these issues, as they have the potential to eliminate the need for continued and repeated litigation.

## COUNT TWO
**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301,** *et seq.*
**(Brought on behalf of the Nationwide Class)**

142.    Plaintiffs, on behalf of themselves and the proposed Nationwide Class, hereby re-allege the paragraphs above as if fully set forth herein.

143.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

144.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301(1).

145.    Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. §2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

27

146.    Nissan is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

147.    Under 15 U.S.C. § 2310(d)(1), the MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

148.    Nissan provided all purchasers and lessees of Class Vehicles with an implied warranty, but breached this warranty as described in more detail above, including by selling and leasing Class Vehicles that are equipped with defective floorboards that are prone to rusting at a level that makes the vehicles unfit for the ordinary and intended purpose for which such vehicles are used.

149.    Nissan's breach of warranty has deprived Plaintiffs and other Class members of the benefit of their bargain.

150.    As a direct and proximate result of Nissan's conduct, Plaintiffs and other Class members have suffered damages and continue to suffer damages and other losses in an amount to be determined at trial.

151.    Plaintiffs and each of the Nationwide Class members have had sufficient direct dealings with either Nissan or its agents to establish privity of contract between Nissan and Plaintiffs and each of the Nationwide Class members. Nonetheless, privity is not required here because Plaintiffs and each of the Nationwide Class members are intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically, of Nissan's implied warranties. Nissan's warranty agreements were designed for and intended to benefit the Class. Privity also is not required because the Class Vehicles are dangerous instrumentalities due to the defect and nonconformities outlined herein.

28

152.    Affording Nissan a reasonable opportunity to cure its breach would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Nissan knew, should have known, or was reckless in not knowing of its misrepresentation concerning the Altima's or Maxima's inability to perform as warranted, but nonetheless failed to rectify the situation or disclose the defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure or afford Nissan a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

153.    Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Accordingly, Plaintiffs and the other Nationwide Class members have not re-accepted their Class Vehicles by retaining them.

154.    The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

155.    Plaintiffs, individually and on behalf of the Nationwide Class, seek equitable relief, including rescission, and all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial, as well as attorneys' fees.

## COUNT THREE
### Fraudulent Concealment
### (Brought on behalf of the Nationwide Class)

156.    Plaintiffs, on behalf of themselves and the proposed Nationwide Class, hereby re-allege the paragraphs above as if fully set forth herein.

157.    Nissan concealed material facts from Plaintiffs, the Nationwide Class, the public, and NHTSA. Nissan knew that Class Vehicles are defective and thus prone to rusting floorboards, but Nissan concealed those facts. Consumers in the United States had no knowledge of the defect.

158.    Nissan had a duty to disclose the defect to Plaintiffs, the Nationwide Class, the public, and NHTSA, but failed to do so.

159.    Nissan knew that Plaintiffs and the Nationwide Class had no knowledge of the defect and that neither Plaintiffs nor the Nationwide Class had an equal opportunity to discover the facts. Nissan was in a superior position over Plaintiffs and the Nationwide Class.

160.    By failing to disclose the material facts concerning the defect in the Class Vehicles, Nissan intended to induce Plaintiffs and the Nationwide Class to purchase or lease the Class Vehicles.

161.    Plaintiffs and the Nationwide Class would not have purchased or leased the Class Vehicles had they known of the defect, or would not have paid as much as they did.

162.    Nissan reaped the benefit of the sales and leases of Class Vehicles as a result of its nondisclosure.

163.    As a direct and proximate cause of Nissan's conduct, Plaintiffs and the Nationwide Class have suffered or will suffer damages, including the diminished value of their Class Vehicles as a result of the defect and Nissan's wrongful conduct related to same.

164.    Nissan's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the Nationwide Class, such that punitive damages are appropriate.

## COUNT FOUR
### Negligence
### (Brought on behalf of the Nationwide Class)

165.    Plaintiffs, on behalf of themselves and the proposed Nationwide Class, hereby re-allege the paragraphs above as if fully set forth herein.

166.    Nissan owes Plaintiffs and the Nationwide Class a duty to provide thorough notice of known safety defects, such as the defect outlined herein.

167.    Nissan also owes Plaintiffs and the Nationwide Class a duty, once it discovered the defect, to ensure that an appropriate repair procedure was developed and made available to consumers.

168.    Nissan owes Plaintiffs and the Nationwide Class a duty not to engage in fraudulent or deceptive conduct, including the knowing concealment of material information such as the existence of the defect. This duty is independent of any contractual duties Nissan may owe or have owed.

169.    Nissan also owes an independent duty to Plaintiffs and the Nationwide Class to disclose the floorboard defect under the TREAD Act, 49 U.S.C. §§ 30101 *et seq.*, and its implementing regulations. Under the Act, Nissan must send notice to Altima or Maxima owners, purchasers, and dealers whenever it "learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." 49 U.S.C. § 30118(c). Nissan was aware of the defect in Class Vehicles, yet failed to timely notify vehicle owners, purchasers, and dealers about the defect. This duty is independent of any contractual duties Nissan may owe or have owed.

170.    Nissan also has a duty to notify NHTSA of the floorboard defect within five working days of discovering the defect. 49 C.F.R. § 573.6. Nissan was aware of the defective

31

floorboards in the Class Vehicles, yet failed to timely notify the NHTSA. This duty is independent of any contractual duties Nissan may owe or have owed.

171.    A finding that Nissan owes a duty to Plaintiffs and the Nationwide Class would not significantly burden Nissan. Nissan has the means to efficiently notify drivers of Nissan vehicles about dangerous defects. The cost borne by Nissan for these efforts is insignificant in light of the dangers posed to Plaintiffs and the Nationwide Class by Nissan's failure to disclose the defect and provide an appropriate notice and repair.

172.    Nissan's failure to disclose the defective floorboards in Class Vehicles to consumers and the NHTSA was a departure from the reasonable standard of care.

173.    Accordingly, Nissan breached its duties to Plaintiffs and the Nationwide Class.

174.    Moreover, Nissan's conduct was contrary to public policy favoring the disclosure of defects that may affect customer safety; these policies are embodied in the TREAD Act, and the notification requirements in 49 C.F.R. §§ 573.1 *et seq.*

175.    As a direct, reasonably foreseeable, and proximate result of Nissan's failure to exercise reasonable care, inform Plaintiffs and the Nationwide Class of the defect, and provide appropriate repair procedures for the defect, Plaintiffs and the Nationwide Class have suffered damages including spending more money on Class Vehicles than they otherwise would have, which are of diminished value, and on repairs to their Class Vehicles.

176.    Plaintiffs and the Nationwide Class could not have prevented the injuries caused by Nissan's negligence through the exercise of reasonable diligence. Neither Plaintiffs nor the Nationwide Class contributed in any way to Nissan's failure to provide appropriate notice and repair procedures.

177.    Plaintiffs, individually and on behalf of the Nationwide Class, seek to recover the damages caused by Nissan. Because Nissan acted fraudulently and with wanton and reckless misconduct, Plaintiffs also seek an award of exemplary damages.

**COUNT FIVE**
**Unjust Enrichment**
**(Brought on behalf of the Nationwide Class)**

178.    Plaintiffs, on behalf of themselves and the proposed Nationwide Class, hereby re-allege the paragraphs above as if fully set forth herein.

179.    Nissan had knowledge of the defect and the serious safety risks it poses, which it failed to disclose to Plaintiffs and the Nationwide Class.

180.    As a result of Nissan's wrongful and fraudulent acts and omissions, as set forth above, Nissan obtained monies which rightfully belong to Plaintiffs and the Nationwide Class to the detriment of Plaintiffs and the Nationwide Class.

181.    Nissan appreciated, accepted and retained the non-gratuitous benefits (i.e., profits) conferred by Plaintiffs and the Nationwide Class members who had no knowledge of the defect. Plaintiffs and the Nationwide Class members either paid a higher price for their Class Vehicles that actually had lower values or paid Nissan monies for Class Vehicles that Plaintiffs and the Nationwide Class members would not have purchased had they been aware of the defect.

182.    It would be inequitable and unjust for Nissan to retain these wrongfully obtained profits.

183.    Nissan's retention of these wrongfully-obtained profits would violate the fundamental principles of justice, equity and good conscience.

184.    Plaintiffs and the Nationwide Class are entitled to restitution of the profits unjustly obtained, plus interest.

**COUNT SIX**
**Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1, *et seq.***
**(Brought on behalf of the Alabama State Consumer Class)**

185.    Plaintiff Juanita Walker, on behalf of herself and the proposed Alabama State Consumer Class ("Alabama Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

186.    Plaintiff Walker and the Alabama Subclass are "consumers" within the meaning of Ala. Code § 8-19-3(2).

187.    Plaintiff Walker, the Alabama Subclass, and Nissan are "persons" within the meaning of Ala. Code § 8-19-3(5).

188.    The Class Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

189.    Nissan was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

190.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several types of conduct to be unlawful, including: (1) representing that goods or services have characteristics that they do not have; (2) representing that goods or services are of a particular standard, quality, or grade if they are of another; or (3) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce. *See* Ala. Code § 8-19-5.

191.    As set forth herein, Nissan engaged in deceptive business practices prohibited by the Alabama DTPA, including but not limited to, misrepresenting the defect in the Class Vehicles, concealing the defect in the Class Vehicles, and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

34

192.    Nissan owed Plaintiff Walker and the Alabama Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

193.    Nissan knew or should have known that its conduct violated the Alabama DTPA.

194.    Nissan's violations present a continuing risk to Plaintiff Walker and the Alabama Subclass, as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

195.    As a direct and proximate result of Nissan's violations of the Alabama DTPA, Plaintiff Walker and the Alabama Subclass have suffered injury-in-fact and/or actual damage.

196.    Pursuant to Ala. Code § 8-19-10, Plaintiff Walker and the Alabama Subclass seek monetary relief against Nissan measured as the greater of (1) actual damages in an amount to be determined at trial and (2) statutory damages in the amount of $100 for each Plaintiff and each member of the Alabama Subclass.

197.    Plaintiff Walker and the Alabama Subclass also seek an order enjoining Nissan's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other relief available under Ala. Code §§ 8-19-1, *et seq.*

198.    In accordance with Ala. Code §8-19-10(e), counsel for Plaintiff Walker and the Alabama Subclass will serve Nissan with notice of its alleged violations of the Alabama DTPA and demand that Nissan correct or agree to correct the actions described therein.

**COUNT SEVEN**
**Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA")**
**815 ILCS 505/1 *et seq.***
**(Brought on behalf of the Illinois Subclass)**

199.    Plaintiff Marie Demaria, on behalf of herself and the proposed Illinois State Consumer Class ("Illinois Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

200.    Nissan is a "person" as that term is defined in 815 ILCS 505/1(c).

201.    Plaintiff Demaria and the Illinois Subclass are "consumers" under 815 ILCS 505/1(e).

202.    The CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

203.    Nissan participated in misleading, false or deceptive acts that violated the CFA. Nissan knows the Class Vehicles are defective and has known of the defect dating back to when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Demaria and the Illinois Subclass.

204.    Nonetheless, Nissan concealed and continues to conceal its knowledge of the defect from consumers, including when it sold Class Vehicles as safe for normal use.

205.    The defect created and continues to create serious safety risks, which were hidden from consumers.

36

206.    No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

207.    Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

208.    Nissan's intentional misrepresentations, omissions and concealments of material fact constitute unfair and/or deceptive practices in violation of the CFA.

209.    Plaintiff Demaria and the Illinois Subclass suffered injury-in-fact as a direct result of Nissan's violations of the CFA in that they have purchased or leased Class Vehicles that pose an immediate safety risk and will have to be repaired or replaced.

210.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Demaria and the Illinois Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

211.    Plaintiff Demaria and the Illinois Subclass also have been denied the use of their Class Vehicles, expended money on replacements, repairs, and damage to their Class Vehicles and suffered as a result of Nissan's conduct.

212.    Nissan's violation of the CFA is continuing in that it continues to conceal the defective nature of the Class Vehicles by refusing to issue a recall, by refusing to notify customers of the serious safety issues posed by the defect, and refusing to offer cost-free repair or replacement of the defective Class Vehicles to consumers.

213.    As a direct and proximate result of Nissan's violation of the CFA, Plaintiff Demaria and the Illinois Subclass were damaged.

**COUNT EIGHT**
**Illinois Uniform Deceptive Trade Practices Act ("Illinois DTPA"), 815 ILCS 510/1**
**(Brought on behalf of the Illinois Subclass)**

214.    Plaintiff Marie Demaria, on behalf of herself and the proposed Illinois State Consumer Class ("Illinois Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

215.    Under the Illinois DTPA, 815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation," the person does any of the following: (1) represents that goods or services have characteristics that they do not have; (2) represents that goods or services are of a particular standard, quality, or grade if they are of another; or (3) engages in any other conduct which creates a likelihood of confusion or misunderstanding.

216.    Nissan is a "person" within the meaning of 815 ILCS 510/1(5).

217.    Nissan's actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of 815 ILCS 510/1, *et seq.*

218.    All of the conduct alleged herein occurred in the course of Nissan's business and was part of a pattern or generalized course of conduct.

219.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Demaria and the Illinois Subclass.

220.    Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

221.    The defect created and continues to create serious safety risks, which were hidden from consumers.

38

222.    No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

223.    Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

224.    Nissan owed Plaintiff Demaria and the Illinois Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

225.    By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Illinois DTPA.

226.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Demaria and the Illinois Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

227.    Nissan's deceptive, unfair, fraudulent and unlawful conduct alleged herein was designed to induce and did induce Plaintiff Demaria and the Illinois Subclass members to purchase the Class Vehicles.

228.    Nissan violated the Illinois DTPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class

39

Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

229.    As a direct and proximate result of Nissan's violation of the Illinois DTPA, Plaintiff Demaria and the Illinois Subclass were damaged.

<u>**COUNT NINE**</u>
**Iowa Consumer Frauds Act, Iowa Code § 714H.1,** *et seq.*
**(Brought on behalf of the Iowa Subclass)**

230.    Plaintiff Keith Siefken, on behalf of himself and the proposed Iowa State Consumer Class ("Iowa Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

231.    Nissan is a "person" under Iowa Code § 714H.2(7).

232.    Plaintiff Siefken and the Iowa Subclass are "consumers," as defined by Iowa Code § 714H.2(3), who purchased or leased Class Vehicles.

233.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud . . . or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice . . . in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

234.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Siefken and the Iowa Subclass.

235.    Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

40

236.    The defect created and continues to create serious safety risks, which were hidden from consumers.

237.    No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

238.    Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

239.    Nissan owed Plaintiff Siefken and the Iowa Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

240.    By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Iowa CFA.

241.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Siefken and the Iowa Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

242.    Nissan's deceptive, unfair, fraudulent and unlawful conduct alleged herein was designed to induce and did induce Plaintiff Siefken and the Iowa Subclass members to purchase the Class Vehicles.

243.    Nissan violated the Iowa CFA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to

disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

244.     Nissan's violations present a continuing risk to Plaintiff Siefken and the Iowa Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

245.     As a direct and proximate result of Nissan's violation of the Iowa CFA, Plaintiff Siefken and the Iowa Subclass were damaged.

246.     Pursuant to Iowa Code § 714H.5, Plaintiff Siefken and the Iowa Subclass seek an order enjoining Nissan's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of Nissan's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other relief the Court deems necessary to protect the public from further violations of the Iowa CFA.

<u>**COUNT TEN**</u>
**Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623, *et seq.***
**(Brought on behalf of the Kansas Subclass)**

247.     Plaintiff Herb Brown, on behalf of himself and the proposed Kansas State Consumer Class ("Kansas Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

248.     Nissan is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(1).

249.    Plaintiff Brown and the Kansas Subclass are "consumers," as defined by Kan. Stat. Ann. § 50-624(b), who purchased or leased Class Vehicles.

250.    The sale of the Class Vehicles to Plaintiff Brown and the Kansas Subclass was a "consumer transaction" within the meaning of Kan. Stat. Ann. §50-624(c).

251.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction . . ." Kan. Stat. Ann. § 50-626(a). It also provides that no supplier shall engage in "the willful concealment, suppression or omission of a material fact" or "any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(b)(3) and 50-627(a).

252.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Brown and the Kansas Subclass.

253.    Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

254.    The defect created and continues to create serious safety risks, which were hidden from consumers.

255.    No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

256.    Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

257.    Nissan owed Plaintiff Brown and the Kansas Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed

43

by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

258. By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Kansas CPA.

259. Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Brown and the Kansas Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

260. Nissan violated the Kansas CPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

261. Nissan's violations present a continuing risk to Plaintiff Brown and the Kansas Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

262. As a direct and proximate result of Nissan's violation of the Kansas CPA, Plaintiff Brown and the Kansas Subclass were damaged.

263. Pursuant to Kan. Stat. Ann. § 50-634, Plaintiff Brown and the Kansas Subclass seek monetary relief against Nissan for actual damages in an amount to be determined at trial for each Plaintiff and member of the Kansas Subclass.

264. Plaintiff Brown and the Kansas Subclass also seek an order enjoining Nissan's unfair and/or deceptive acts or practices; declaratory relief; attorneys' fees; and such other relief that is available under Kan. Stat. Ann. § 50-623 *et seq.*

**COUNT ELEVEN**
**Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.110,** *et seq.*
**(Brought on behalf of the Kentucky Subclass)**

265. Plaintiff Candace Kixmiller, on behalf of herself and the proposed Kentucky State Consumer Class ("Kentucky Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

266. Nissan, Plaintiff Kixmiller, and the Kentucky Subclass are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

267. Nissan engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

268. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. § 367.170(1). Nissan engaged in misleading, false and deceptive acts that violated the Kentucky CPA.

269. Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Kixmiller and the Kentucky Subclass.

270. Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

45

271.     The defect created and continues to create serious safety risks, which were hidden from consumers.

272.     No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

273.     Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

274.     Nissan owed Plaintiff Kixmiller and the Kentucky Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

275.     By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Kentucky CPA.

276.     Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Kixmiller and the Kentucky Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

277.     Nissan violated the Kentucky CPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class

46

Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

278.   Nissan's violations present a continuing risk to Plaintiff Kixmiller and the Kentucky Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

279.   As a direct and proximate result of Nissan's violation of the Kentucky CPA, Plaintiff Kixmiller and the Kentucky Subclass were damaged.

280.   Pursuant to Ky. Rev. Stat. § 367.220, Plaintiff Kixmiller and the Kentucky Subclass seek to recover actual damages in an amount to be determined at trial; an order enjoining Nissan's unfair, unlawful and/or deceptive practices; declaratory relief; punitive damages; attorneys' fees; and any other relief available under section 367.220.

**COUNT TWELVE**
**Maryland Consumer Protection Act ("MCPA"), Md. Code Com. Law § 13-101, *et seq.***
**(Brought on behalf of the Maryland Subclass)**

281.   Plaintiff Roslyn Corbin, on behalf of herself and the proposed Maryland State Consumer Class ("Maryland Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

282.   Nissan, Plaintiff Corbin, and the Maryland Subclass are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

283.   The MCPA provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md. Code Com. Law § 13-303. As set forth herein, Nissan participated in misleading, false, or deceptive acts that violated the MCPA.

47

284.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Corbin and the Maryland Subclass.

285.    Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

286.    The defect created and continues to create serious safety risks, which were hidden from consumers.

287.    No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

288.    Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles could prematurely fail, were dangerous to occupants and should be replaced.

289.    Nissan owed Plaintiff Corbin and the Maryland Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs that contradicted those representations.

290.    By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the MCPA.

291.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Corbin and the Maryland Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

48

292.     Nissan violated the MCPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

293.     Nissan's violations present a continuing risk to Plaintiff Corbin and the Maryland Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

294.     As a direct and proximate result of Nissan's violation of the MCPA, Plaintiff Corbin and the Maryland Subclass were damaged.

295.     Pursuant to Md. Code Com. Law § 13-408, Plaintiff Corbin and the Maryland Subclass seek to recover actual damages in an amount to be determined at trial; attorneys' fees; and any other relief available under the MCPA.

## COUNT THIRTEEN
### Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, *et seq.*
### (Brought on behalf of the Michigan Subclass)

296.     Plaintiff Donald Young, on behalf of himself and the proposed Michigan State Consumer Class ("Michigan Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

297.     Plaintiff Young and the Michigan Subclass are "person[s]" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

298.     At all relevant times, Nissan is a "person" engaged in "trade or commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(d) and (g).

299. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903(1).

300. Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Young and the Michigan Subclass.

301. Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

302. The defect created and continues to create serious safety risks, which were hidden from consumers.

303. No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

304. Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

305. Nissan owed Plaintiff Young and the Michigan Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

306. By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Michigan CPA.

50

307.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Young and the Michigan Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

308.    Nissan violated the Michigan CPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

309.    Nissan's violations present a continuing risk to Plaintiff Young and the Michigan Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

310.    As a direct and proximate result of Nissan's violation of the Michigan CPA, Plaintiff Young and the Michigan Subclass were damaged.

311.    Plaintiff Young and the Michigan Subclass seek monetary relief against Nissan measured as the greater of (1) actual damages in an amount to be determined at trial and (2) statutory damages in the amount of $250 for each Plaintiff and each member of the Michigan Subclass.

312.    Plaintiff Young and the Michigan Subclass also seek an order enjoining Nissan's unfair and/or deceptive practices; reasonable attorneys' fees; costs; and any other relief available under the Michigan CPA.

313.    Plaintiff Young and the Michigan Subclass also seek punitive damages against Nissan because it carried out despicable conduct with willful and conscious disregard of the

rights and safety of others. Nissan's conduct constitutes malice, oppression and fraud warranting punitive damages.

**COUNT FOURTEEN**
**Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010,** *et seq.*
**(Brought on behalf of the Missouri Subclass)**

314.     Plaintiffs Sheri Grimm and Twila Ashworth, on behalf of themselves and the proposed Missouri State Consumer Class ("Missouri Subclass"), hereby re-allege the paragraphs above as if fully set forth herein.

315.     Plaintiffs Grimm and Ashworth, members of the Missouri Subclass, and Nissan are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

316.     Nissan's activities constitute the sale of "merchandise" within the meaning of Mo. Rev. Stat. § 407.010(4).

317.     As set forth herein, Nissan's acts, practices and conduct violated Mo. Rev. Stat. § 407.020(1) in that, among other things, Nissan has used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of Class Vehicles.

318.     Nissan's unfair, unlawful and deceptive acts, practices, and conduct include selling Class Vehicles with a material defect and concealing the existence of that defect, thereby endangering and harming Plaintiffs and the Missouri Subclass. Nissan's conduct violates the MPA.

319.     Nissan's conduct also violates the enabling regulations for the MMPA because it: (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes substantial injury to consumers; (4) was not in good faith; (5) is unconscionable; and (6) is unlawful. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.

320.     As a direct and proximate result of Nissan's unfair and deceptive acts, Plaintiffs Grimm and Ashworth, and the Missouri Subclass have suffered damages in that they spent more money on Class Vehicles and related purchases than they otherwise would have and are left with vehicles that cannot be safely driven and which are of diminished value.

321.     Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiffs Grimm and Ashworth, and the Missouri Subclass.

322.     Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

323.     The defect created and continues to create serious safety risks, which were hidden from consumers.

324.     No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

325.     Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

326.     Nissan owed Plaintiffs Grimm and Ashworth, and the Missouri Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

327. By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Missouri MPA.

328. Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiffs Grimm and Ashworth, and the Missouri Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

329. Nissan violated the Missouri MPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

330. Nissan's violations present a continuing risk to Plaintiffs Grimm and Ashworth and the Missouri Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

331. As a direct and proximate result of Nissan's violation of the Missouri MPA, Plaintiffs Grimm and Ashworth, and the Missouri Subclass were damaged.

332. Plaintiffs Grimm and Ashworth, and the Missouri Subclass seek actual damages; a declaration that Nissan's methods, acts and practices violate the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*; an injunction prohibiting Nissan from continuing to engage in such unlawful methods, acts, and practices; restitution; rescission; disgorgement of all profits obtained from Nissan's unlawful conduct; pre and post-judgment interest; punitive

damages; attorneys' fees and costs; and any other relief that the Court deems necessary or proper.

## COUNT FIFTEEN
### New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*
### (Brought on behalf of the New Hampshire Subclass)

333.    Plaintiff Thomas Wilbur, on behalf of himself and the proposed New Hampshire State Consumer Class ("New Hampshire Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

334.    Plaintiff Wilbur, the New Hampshire Subclass, and Nissan were "persons" within the meaning of New Hampshire Consumer Protection Act ("NHCPA"), N.H. Rev. Stat. § 358-A:1(I).

335.    Nissan's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1(II).

336.    Under the NHCPA, a person, in the conduct of trade or commerce, may not use "any unfair or deceptive act or practice," including but not limited to (1) representing that goods or services have characteristics that they do not have; (2) representing that goods or services are of a standard or quality if they are of another; and (3) advertising goods or services with the intent not to sell them as advertised. N.H. Rev. Stat. § 358-A:2.

337.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Wilbur and the New Hampshire Subclass.

338.    Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

339.    The defect created and continues to create serious safety risks, which were hidden from consumers.

340.    No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

341.    Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

342.    Nissan owed Plaintiff Wilbur and the New Hampshire Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

343.    By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the NHCPA.

344.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Wilbur and the New Hampshire Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

345.    Nissan violated the NHCPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class

56

Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

346.    Nissan's violations present a continuing risk to Plaintiff Wilbur and the New Hampshire Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

347.    As a direct and proximate result of Nissan's violation of the NHCPA, Plaintiff Wilbur and the New Hampshire Subclass were damaged.

348.    Because Nissan's wrongful conduct was willful, Plaintiff Wilbur and the New Hampshire Subclass seek recovery of damages in an amount of three times the amount of actual damages or $1,000, whichever is greater, costs and reasonable attorneys' fees, an order enjoining Nissan's unfair and/or deceptive acts and practices, and any other relief available under N.H. Rev. Stat. § 358-A:10.

### COUNT SIXTEEN
**(Violations of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. § 56:8-1 *et seq.*)**
**(Brought on behalf of New Jersey subclass)**

349.    Plaintiff Peter Petersen on behalf of himself and the proposed New Jersey State Consumer Class ("New Jersey Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

350.    As discussed, Plaintiff Petersen and New Jersey Subclass are consumers who purchased or leased Class Vehicles in New Jersey. Nissan promotes, distributes, and sells its vehicles to consumers throughout New Jersey, including to Plaintiff Petersen and the proposed class members. This conduct affects trade and commerce.

351.    The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, proscribes unlawful practices causing ascertainable losses, including "any unconscionable commercial

practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression[,] or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived[,] or damaged thereby."

352.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Petersen and the New Jersey Subclass.

353.    Nissan affirmatively misrepresented and intentionally and knowingly concealed or omitted or failed to disclose these safety risks when promoting the vehicles to Plaintiff Petersen and the New Jersey Subclass.

354.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Petersen and the New Jersey Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

355.    Nissan has engaged, and continues to engage, in these unlawful practices. As discussed above, Nissan:

      a.    Represented that Class Vehicles had characteristics, uses, benefits, and qualities that they did not have;

      b.    Represented that Class Vehicles are of a particular standard and quality when they are not;

      c.    Advertised Class Vehicles with the intent not to sell them as advertised; and

      d.    Otherwise engaged in conduct likely to deceive consumers.

356.    These acts and practices offend established public policy because the harm Nissan causes consumers by concealing and omitting the Class Vehicles' serious safety risks outweighs any legitimate benefit associated with such practices.

357.    As a direct and proximate result of Nissan's unlawful conduct in violation of the New Jersey Consumer Fraud Act, Plaintiff Petersen and the members of the New Jersey Subclass have suffered ascertainable losses, including damages stemming from vehicle repair and to their vehicles.

358.    Plaintiff Petersen and the members of the New Jersey Subclass are also entitled to treble damages, attorneys' fees, filing fees, and costs of suit, because Nissan committed the unlawful practice described here, and because Plaintiff Petersen and members of the New Jersey Subclass have suffered ascertainable losses caused by those unlawful practices.

359.    Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiff Petersen will serve the New Jersey Attorney General with a copy of this class action complaint.

### COUNT SEVENTEEN
### New York General Business Law, N.Y. Gen. Bus. Law § 349
### (Brought on behalf of the New York Subclass)

360.    Plaintiff Joseph Miller, on behalf of himself and the proposed New York State Consumer Class ("New York Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

361.    Plaintiff Miller and the New York Subclass are "persons" within the meaning of the New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 349(h).

362.    Nissan is a "person," "firm," "corporation," or "association" within the meaning of the NYGBL.

363.     The NYGBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349(a). Nissan's conduct directed toward consumers, as described herein, constitutes "deceptive acts or practices" within the meaning of the NYGBL.

364.     Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Miller and the New York Subclass.

365.     Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

366.     The defect created and continues to create serious safety risks, which were hidden from consumers.

367.     No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

368.     Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

369.     Nissan owed Plaintiff Miller and the New York Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

370. By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the NYGBL.

371. Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Miller and the New York Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

372. Nissan violated the NYGBL when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

373. Nissan's violations present a continuing risk to Plaintiff Miller and the New York Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

374. As a direct and proximate result of Nissan's violation of the NYGBL, Plaintiff Miller and the New York Subclass were damaged.

375. Plaintiff Miller and the New York Subclass seek punitive damages against Nissan because its conduct was egregious. Nissan misrepresented the safety and reliability of Class Vehicles, concealed the defect alleged herein, and concealed materials facts that only Nissan knew. Nissan's egregious conduct warrants punitive damages.

376. Because Nissan's wrongful conduct was willful and knowing, Plaintiff Miller and the New York Subclass seek recovery of actual damages or $50, whichever is greater,

discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Nissan's unfair and/or deceptive acts and practices, and any other relief available under the NYGBL.

**COUNT EIGHTEEN**
**New York General Business Law, N.Y. Gen. Bus. Law § 350**
**(Brought on behalf of the New York Subclass)**

377.    Plaintiff Joseph Miller, on behalf of himself and the proposed New York State Consumer Class ("New York Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

378.    Nissan was and is engaged in the "conduct of business, trade or commerce" within the meaning of the New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 350.

379.    Section 350 of the NYGBL makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350-a(1).

380.    Through its advertising, Nissan caused to be made or disseminated throughout New York statements that were untrue or misleading, and that were known, or which should have been known to Nissan, to be untrue and misleading to consumers in New York.

381.    Nissan violated section 350 of the NYGBL because the misrepresentations and omissions regarding the defect in Class Vehicles, and Nissan's failure to disclose and active concealing of the defect, were material and likely to deceive a reasonable consumer.

62

382.    As a direct and proximate result of Nissan's violation of section 350 of the NYGBL, Plaintiff Miller and the New York Subclass were damaged in that they would not have purchased Class Vehicles and/or paid as much for them.

383.    Under section 350(e), Plaintiff Miller and the New York Subclass seek monetary relief against Nissan measured as (1) actual damages in an amount to be determined at trial, and (2) statutory damages in the amount of $500 for each member of the New York Subclass. Because Nissan's conduct was committed willfully and knowingly, New York Subclass members are entitled to recover three times actual damages, up to $10,000, for each member of the New York Subclass.

384.    Plaintiff Miller and the New York Subclass also seek an order enjoining Nissan's unfair, unlawful and/or deceptive practices; attorneys' fees; and any other relief available under section 350 of the NYGBL.

## COUNT NINETEEN
### Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*
### (Brought on behalf of the Ohio Subclass)

385.    Plaintiff Tammy Petty, on behalf of herself and the proposed Ohio State Consumer Class ("Ohio Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

386.    Nissan is a "supplier" as that term is defined in Ohio Rev. Code § 1345.01(C).

387.    Plaintiff Petty and the Ohio Subclass are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and leases of the Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

388.    The Ohio Consumer Sales Practices Act ("Ohio CSPA"), codified at Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer

63

transaction. Specifically, the Ohio CSPA prohibits suppliers from representing that goods have characteristics or benefits when they do not; that goods are of a particular quality or grade they are not; or the subject of a consumer transaction has been supplied in accordance with a previous representation if it has not. As set forth herein, Nissan participated in misleading, false, or deceptive acts that violated the Ohio CSPA.

389.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Petty and the Ohio Subclass.

390.    Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

391.    The defect created and continues to create serious safety risks, which were hidden from consumers.

392.    No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

393.    Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles could prematurely fail, were dangerous to occupants and should be replaced.

394.    Nissan owed Plaintiff Petty and the Ohio Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs that contradicted those representations.

64

395. By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Ohio CSPA.

396. Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Petty and the Ohio Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

397. Nissan violated the Ohio CSPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

398. Nissan's violations present a continuing risk to Plaintiff Petty and the Ohio Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

399. As a direct and proximate result of Nissan's violation of the Ohio CSPA, Plaintiff Petty and the Ohio Subclass have suffered injury-in-fact and/or actual damage.

400. Plaintiff Petty and the Ohio Subclass seek punitive damages against Nissan because Nissan's conduct was egregious. Nissan misrepresented the safety and reliability of the Class Vehicles, concealed defects in the Class Vehicles, and concealed facts that only Nissan knew. Nissan's egregious conduct warrants punitive damages.

401. Additionally, pursuant to Ohio Rev. Code § 1345.09 *et seq.*, Plaintiff Petty and the Ohio Subclass seek to recover actual and statutory damages in an amount to be determined at

trial; an order enjoining Nissan's deceptive and unfair conduct; treble damages; court costs; and reasonable attorneys' fees.

402.    Because this action is brought in federal court, rather than a state court in Ohio, Plaintiffs are not obligated to plead or establish before class certification that Nissan had advance notice of the deceptive nature of its conduct.  In the alternative, Nissan did in fact have sufficient notice that its alleged conduct was deceptive.  *See, e.g.*, *Fribourg v. Vandemark*, No. CA99-02-017, 1999 WL 552741 (Oh. Ct. App. July 26, 1999); *Howard v. Norman's Auto Sales*, No. 02AP-1001, 2003 WL 21267261 (Oh. Ct. App. June 3, 2003); *Mason v. Mercedes-Benz USA, LLC*, No. 85031, 2005 WL 1995087 (Oh. Ct. App. Aug. 18, 2005); *Nessle v. Whirlpool Corp.*, No. 07-3009, 2008 WL 2967703 (N.D. Ohio Jul. 25, 2008); ); *In re Philips/Magnavox Television Litig.*, No. 09–3072, 2010 WL 3522787 (D.N.J. Sep. 1, 2010); *Blankenship v. CFMOTO Powersports, Inc.*, 944 N.E.2d 769 (Oh. Ct. Comm. Pl. Jan. 2011); *Nelson v. Nissan N. Am., Inc.*, 894 F. Supp. 2d 558 (D.N.J. 2012).

## COUNT TWENTY
### Pennsylvania Unfair Trade Practices and Consumer Protection Law
### Pa. Stat. Ann. § 201-1, *et seq.*
### (Brought on behalf of the Pennsylvania Subclass)

403.    Plaintiff Laurie Sauder, on behalf of herself and the proposed Pennsylvania State Consumer Class ("Pennsylvania Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

404.    Plaintiff Sauder and the Pennsylvania Subclass purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

405.    Nissan's actions as set forth herein occurred in the conduct of trade or commerce as defined under 73 P.S. § 201-2(3).

66

406.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including (1) representing that goods or services have characteristics that they do not have; (2) representing that goods or services are of a standard or quality if they are of another; (3) advertising goods or services with the intent not to sell them as advertised; and (4) engaging in any other fraudulent or deceptive conduct which creates the likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4).

407.     Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Sauder and the Pennsylvania Subclass.

408.     Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

409.     The defect created and continues to create serious safety risks, which were hidden from consumers.

410.     No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

411.     Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles were dangerous to occupants.

412.     Nissan owed Plaintiff Sauder and the Pennsylvania Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and

67

reliability of the Class Vehicles while purposefully withholding materials facts from Plaintiffs that contradicted those representations.

413.    By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Pennsylvania CPL.

414.    Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Sauder and the Pennsylvania Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

415.    Nissan violated the Pennsylvania CPL when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

416.    Nissan's violations present a continuing risk to Plaintiff Sauder and the Pennsylvania Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

417.    As a direct and proximate result of Nissan's violation of the Pennsylvania CPL, Plaintiff Sauder and the Pennsylvania Subclass were damaged.

418.    Nissan is liable to Plaintiff Sauder and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Additionally, Plaintiff Sauder and the Pennsylvania Subclass are entitled to an award of punitive

damages given that Nissan's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT TWENTY-ONE**
**Virginia Consumer Protection Act, Va. Code Ann. 15 § 59.1-196, *et seq.***
**(Brought on behalf of the Virginia Subclass)**

419.    Plaintiff Gary Olds, on behalf of himself and the proposed Virginia State Consumer Class ("Virginia Subclass"), hereby re-alleges the paragraphs above as if fully set forth herein.

420.    Nissan is a "supplier" under Va. Code Ann. § 59.1-198.

421.    Nissan's sales of the Class Vehicles were "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

422.    The Virginia Consumer Protection Act ("Virginia CPA") prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, the Virginia CPA lists prohibited "practices" which include: misrepresenting that goods or services have certain characteristics; misrepresenting that goods or services are of a particular standard, quality, grade style, or model; and using any other deception, fraud or misrepresentation in connection with a consumer transaction. Va. Code Ann. § 59.1-200. As set forth herein, Nissan violated the Virginia CPA.

423.    Nissan has long known the Class Vehicles are defective, including when it developed, manufactured, marketed and sold the Class Vehicles. Furthermore, Nissan knows the defect poses serious safety risks to consumers like Plaintiff Olds and the Virginia Subclass.

424.    Nonetheless, Nissan has concealed its knowledge of the defect from consumers and sold Class Vehicles as safe for normal use.

69

425.   The defect created and continues to create serious safety risks, which were hidden from consumers.

426.   No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the defect.

427.   Nissan did not recall the defective Class Vehicles, nor did it notify consumers that the Class Vehicles could prematurely fail, were dangerous to occupants and should be replaced.

428.   Nissan owed Plaintiff Olds and the Virginia Subclass a duty to disclose the true safety and reliability of the Class Vehicles because Nissan: (1) possessed exclusive knowledge of the dangers and risks posed by the defect; (2) intentionally concealed the dangers and risks posed by the defect; and/or (3) made incomplete representations about the safety and reliability of the Class Vehicles while purposefully withholding material facts from Plaintiffs that contradicted those representations.

429.   By concealing the serious safety risk posed by its Class Vehicles, concealing the existence of the defect and by representing that the Class Vehicles were safe, Nissan engaged in actionable conduct within the meaning of the Virginia CPA.

430.   Had Nissan disclosed the true quality and defective nature of the Class Vehicles, Plaintiff Olds and the Virginia Subclass would not have purchased the Class Vehicles or would have paid substantially less for them.

431.   Nissan violated the Virginia CPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it breached its duty to disclose the safety risks and the defect, instead selling and distributing the Class

70

Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

432.    Nissan's violations present a continuing risk to Plaintiff Olds and the Virginia Subclass as well as to the general public. Nissan's unlawful acts and practices complained of herein affect the public interest.

433.    As a direct and proximate result of Nissan's violation of the Virginia CPA, Plaintiff Olds and the Virginia Subclass have suffered injury-in-fact and/or actual damage.

434.    Pursuant to Va. Code Ann. § 59.1-204(A), Plaintiff Olds and the Virginia Subclass seek monetary relief against Nissan measured as the greater of (1) actual damages in an amount to be determined at trial, and (2) statutory damages in the amount of $500 for each Plaintiff and each member of the Virginia Subclass.

435.    Additionally, because Nissan's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for Plaintiff Olds individually and each member of the Virginia Subclass, the greater of (1) three times actual damages, or (2) $1,000. Va. Code Ann. § 59.1-204(A).

436.    Plaintiff Olds and the Virginia Subclass also seek an order enjoining Nissan's deceptive and unfair conduct; punitive damages; and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated persons, request that the Court enter judgment against Nissan and in favor of Plaintiffs and the Class and State Subclasses, and grant the following relief:

1.      Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23, and designate and appoint Plaintiffs' chosen counsel as Class Counsel and Plaintiffs as the Class Representatives;

2.      Determine that Nissan's conduct as alleged herein was unlawful, unfair, and/or deceptive and otherwise in violation of law;

3.      Enjoin any such future conduct by Nissan;

4.      Award Plaintiffs and the Class Members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

5.      Award Plaintiffs and the Class Members exemplary damages in such amount as proven;

6.      Award damages and other remedies, including, but not limited to, restitution and statutory penalties, as allowed by any applicable law, such as the consumer laws of the various states;

7.      Award Plaintiffs and the Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

8.      Award Plaintiffs and the Class Members such other further and different relief as the case may require or as determined to be just, equitable and proper by this Court.

## <u>JURY DEMAND</u>

Plaintiffs, on behalf of themselves and all similarly situated persons, demand a trial by jury on all issues that are triable to a jury.

Dated: July 24, 2015          Respectfully submitted,

By:    /s/ Edward A. Wallace

Edward A. Wallace
Amy E. Keller
Adam Prom
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 346-2222 Telephone
eaw@wexlerwallace.com
aek@wexlerwallace.com
ap@wexlerwallace.com

Matthew Dameron
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, MO 64105
(816) 876-2600 Telephone
matt@williamsdirks.com

Eric H. Gibbs
David Stein
**GIBBS LAW GROUP LLP**
One Kaiser Plaza, Suite 1125
Oakland, CA 94612
(510) 350-9700 Telephone
(415) 350-9701 Facsimile
ehg@classlawgroup.com
ds@classlawgroup.com

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
(816) 714-7101 Telephone
siegel@stuevesiegel.com

Tim E. Dollar
**DOLLAR, BURNS & BECKER LLC**
1100 Main Street, Suite 2600
Kansas City, MO 64105
(816) 876-2600
timd@dollar-law.com

73

Gregory F. Coleman
Mark E. Silvey
Lisa Ann White
**GREG COLEMAN LAW PC**
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
(865) 522-0049 Telephone
greg@gregcolemanlaw.com
mark@gregcolemanlaw.com
lisa@gregcolemanlaw.com

John A. Yanchunis
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
(813) 223-5505 Telephone
jyanchunis@ForThePeople.com

*Attorneys for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I, Edward A. Wallace, hereby certify that a copy of the foregoing was filed using this

Court's CM/ECF service, which will send notification of such filing to all counsel of record this

24th day of July 2015.

/s/ Edward A. Wallace
Edward A. Wallace